FIRST DIVISION

No. 1-08-1455

THE PEOPLE OF THE STATE OF ILLINOIS,    )       Appeal from the
                                        )       Circuit Court of
      Plaintiff-Appellee,               )       Cook County.
                                        )
v.                                      )
                                        )
JAMAEL BRAZZIEL,                        )       The Honorable
                                        )       Nicholas R. Ford,
      Defendant-Appellant.              )       Judge Presiding.


      JUSTICE LAMPKIN delivered the opinion of the court:

      A jury convicted defendant, Jamael Brazziel, of first degree

murder proximately caused by his personal discharge of a firearm.

Defendant was sentenced to an aggregate of 60 years'

imprisonment.  On appeal, defendant contends that (1) the State

failed to prove him guilty beyond a reasonable doubt; (2) the

trial court's failure to comply with the mandates of Supreme

Court Rule 431(b) (Official Reports Advance Sheet No. 8 (April

11, 2007), R. 431(b), eff. May 1, 2007) entitles him to a new

trial; (3) the State improperly raised the issue of the defense

witnesses' moral character; and (4) his sentence was excessive in

light of mitigating factors.  Based on the following, we affirm.

FACTS

      On April 26, 2006, the victim, Larry Brown, was shot to

death following an altercation on the west side of Chicago,

1-08-1455

Illinois.

Prior to conducting *voir dire*, the trial judge, in relevant part, told the prospective jurors:

"Under the law, a defendant is presumed to be innocent of the charges against him. The presumption remains with him throughout every stage of the proceeding. It is not overcome unless from all the evidence in this case you are convinced beyond a reasonable doubt that the defendant is guilty.

The State has the burden of proving the guilt of defendant beyond a reasonable doubt. The burden remains on the State throughout the case. The defendant is not required to prove his innocence nor is he required to present any evidence in his own behalf. He may not even testify if he chooses to do so. He doesn't even have a duty to do so. He may rely simply on the presumption of his innocence in this case.

* * *

You shall be bound by your oath as jurors to follow the law as it is given to you. You may not disregard the law as given to you and apply the law that you think individually or collectively should be the law. In other words, I'm going to give you rules

and those are the rules. You're to follow the rules that I give you in conjunction with your review of the evidence, okay? That's important.

* * *

If you become convinced beyond a reasonable doubt from all the charges in this case that the defendant is charged guilty within the indictment, it will be your duty to find him guilty. Do you all understand that?

(Nodding.)

Everybody is nodding.

Is there anyone who cannot follow that law?

I don't see anyone that's indicating that they couldn't.

On the other hand, if after hearing all the evidence in this case you are not convinced beyond a reasonable doubt of the defendant's guilt, it will be your duty to find him not guilty. Do you all understand that instruction?

Everybody is indicating yes.

Is there anyone who doesn't understand that instruction?

I got no one raising their hand. So that won't be something I'll address further."

While conducting *voir dire* of the first panel, the trial court asked the first prospective juror:

"Q. Do you understand if the State proves their case beyond a reasonable doubt, that it will be your duty to find the defendant guilty?

A. Yes, I do.

Q. Do you understand also that if you feel that the defendant's guilt hasn't been proven beyond a reasonable doubt, it would be your duty to find him not guilty?

A. Correct.

Q. Would you follow those rules along with all the other rules in this case in reaching a verdict?

A. Yes."

The judge then directed his inquiry to the entire first panel:

"THE COURT: I'm going to ask that of all of you in the audience, do all of you understand that?

THE VENIRE: Yes.

THE COURT: And would all of you follow that law along with all the other law I give you in the case?

THE VENIRE: Yes.

THE COURT: All indicating yes.  That's important stuff also, folks."

Later, while questioning a different prospective juror from the first panel, the judge inquired:

"Q. Do you understand the defendant--and I'm talking to all of you now and I'm going to see if anybody has a problem with it, just raise your hand.

Do you understand the defendant doesn't have to prove anything; it's the State's burden to prove the defendant guilty beyond a reasonable doubt. Do you understand that?

A. Yes.

Q. And would you follow that law along with all the other law I give you in this case?

A. Yes."

Ten jurors were selected from the first panel. Nine of the ten were asked individually some version of whether the juror could find defendant guilty if the evidence had demonstrated defendant's guilt beyond a reasonable doubt or find him not guilty if the evidence had not demonstrated defendant's guilt beyond a reasonable doubt. Of that group of nine, one juror was asked whether he understood that "defendant has to prove nothing." The juror replied "yes." One other juror in the group of nine was asked, "You heard me talk about the burden of proof and the other things with everyone else. Were there any

questions that you had for me[?]" The juror responded, "No. I understand and I could be objective, yes."

Prior to conducting *voir dire* of the second panel, from which two jurors were selected, the judge addressed the entire panel:

"THE COURT: Good morning. Again, folks, I've given several times the law that you'll all follow as a group. Have you all understood what I've been talking about all morning here?

THE VENIRE: Yes.

THE COURT: And would you follow the law that I've been talking about all morning along with all the other law I give you in this case in reaching a verdict?

THE VENIRE: Yes.

THE COURT: Everyone has indicated yes.

If there was one of these questions that I asked before where you kind of raised your hand, bring it to my attention now when I begin to question you individually."

The judge asked the eleventh impaneled juror:

"Q. Do you understand that it's the State's burden to prove the defendant's guilt beyond a reasonable doubt and that burden remains with him throughout the

entire case?

  A. Yes.

  Q. If the State failed to prove the defendant's guilt beyond a reasonable doubt, could you find him not guilty?

  A. Yes.

  Q. If the State did succeed at proving his guilt beyond a reasonable doubt, could you find him guilty?

  A. Yes."

The judge asked the twelfth impaneled juror:

  "Q. Would you follow all the law I gave you in this case in reaching your verdict?

  A. Yes, sir.

  Q. You've heard me talk about it with many of the jurors before.  Do you have any problem following all of the law that I've given so far?

  A. No.

  Q. And would you do so?

  A. Yes."

*Voir dire* concluded on a Friday.  Opening statements and the presentation of witnesses began the following Monday.  Prior to swearing in the jury, the judge said:

  "Do you all – and I'm going to ask this of the

group.  Do you remember the rules of law that I gave you on Friday?

Everybody is indicating yes.

And will you follow that along with all the other law that I give you in this case in reaching your verdict?

Everybody is indicating yes."

The trial evidence demonstrated that a crowd of teenagers was gathered on the street around 9 p.m. on April 26, 2006.  The victim had been "slap boxing" with a girl named Jean McDaniel.  McDaniel alerted her cousin, Anthony "Red" Raper.  In response, Raper began searching for the victim.  When McDaniel identified the victim, Raper approached him.  Raper and the victim exchanged punches, none of which made contact.  The victim then ran in the opposite direction and the crowd on the street, including Raper, chased after him.  Raper's cousin, defendant, was at the front of that crowd with Raper.  Defendant then drew a handgun and pointed it at the victim.  He fired one fatal shot to the back of the victim's head.  The victim immediately fell to the ground.

The State called six witnesses, all of whom testified to being in or near the crowd when the shooting occurred.  Yolanda Floyd, who lived on the street where the crowd was gathered, and Raper testified that they witnessed defendant shoot the victim as

the victim ran away from the crowd.

Raper said he was next to his cousin, defendant, when defendant pulled a handgun from his waist, pointed the weapon at the victim, and shot the victim. On cross-examination, however, Raper testified that he never saw defendant with a handgun or knew that defendant had a gun. Raper said he did not see defendant at the time of the victim's shooting. Raper testified that he was interviewed by the police in the presence of his mother and he implicated defendant out of fear of being charged himself. Then, on redirect examination, Raper testified that defendant was the shooter. Raper said his direct testimony was the truth. Raper added that he was afraid to testify against his cousin. Raper acknowledged that he was three feet away from defendant when he witnessed defendant draw a handgun and shoot the victim.

Floyd testified that she lived at 5512 W. Cortland Street in Chicago, Illinois. Floyd said she heard commotion on the night in question and exited her house to see 50 to 100 people on her street. Floyd then attempted to retrieve her young children that were playing outside at the time. She heard a female yell, "there he is" and saw someone swing at the victim, Lloyd's neighbor. The victim returned a swing and then ran toward his

house.  Lloyd saw defendant raise a revolver and shoot the gun at the victim.  Lloyd was approximately eight feet from defendant when he shot the victim.  The victim was approximately one to two feet from Lloyd when he was shot.  Lloyd identified defendant as the shooter in a photographic array and during a lineup.  Lloyd testified that her son was friends with the victim.

Shontrice Smith testified that she was with Lakesha Gibbs and the victim on the night in question.  Smith witnessed the fight between the victim and Raper and saw the crowd chasing the victim.  Smith said she heard a gunshot and saw that the victim had been shot.  In response, Smith ran in the opposite direction of the crowd.  According to Smith, she was 5 or 10 feet away from the victim when he was shot.  Smith testified that she did not remember if she saw the shooter.  Smith testified that she was interviewed in her mother's presence a few hours after the shooting.  She provided a statement to the police and identified defendant as the shooter in a photographic array.  Smith testified that she could not recall identifying defendant as the shooter; however, Smith admitted that she and her mother signed each page of her statement.  The State introduced Smith's handwritten statement.  Smith also identified defendant as the shooter before the grand jury.  At trial, however, Smith said she could not remember testifying before the grand jury.  Smith was

treated as a hostile witness.  The State introduced Smith's grand jury testimony, in which Smith testified that she was five feet away from defendant when he shot the victim.

Gibbs testified that she saw a crowd approach Cortland Street on the night in question.  Gibbs witnessed Raper and the victim exchange swings.  The victim then walked toward his house. Gibbs could not recall whether the crowd followed the victim. Gibbs did not see anything else.  She could not recall hearing a gunshot or seeing defendant shoot the victim.  Gibbs recalled speaking to the police following the incident, but did not recall providing a written statement.  Gibbs acknowledged that her statement provided that she was off to the side of the victim when defendant fired a handgun.  In the statement, Gibbs said she could clearly see defendant and he was the only individual with a handgun.  The State introduced Gibbs' signed, handwritten statement.  Gibbs testified that she did not recall testifying before the grand jury.  Gibbs did not remember testifying that she was a couple of inches away from defendant when he shot the victim.  The State introduced Gibbs' grand jury testimony inculpating defendant.

DeSean Henry testified that he witnessed the fight between Raper and the victim; however, Henry was at home prior to the

shooting and did not see anything.  Henry testified that he spoke to the police and provided a handwritten statement following the incident while in the presence of his mother, but said the statement was untrue.  Henry testified that he provided the false statement because he was threatened by the police.  Henry and his mother signed each page of the statement.  The State introduced Henry's statement and his grand jury testimony, both of which reflected that Henry reported being near defendant when defendant shot the victim.  Henry testified at trial that he lied in his grand jury testimony because the police told him what to say.

A law clerk from the State's Attorney's office later testified that, while accompanying Henry to the courtroom prior to his testimony, Henry was talking on his cellular telephone. The clerk overheard Henry say that "Red flipped" and that if he testified that "I don't remember, they can't do anything."  Henry admitted having a phone conversation in front of the law clerk. Henry admitted reporting that "Red flipped," but denied saying, "if I say I don't remember, they can't do anything to me."

Johnny Ceasar testified that he was walking on the street where the crowd was gathered when he heard two gunshots.  Caesar did not see anyone get shot.  Ceasar ran home in response. Ceasar initially said he spoke to the police and the prosecutor; however, Ceasar testified that the police told him what to say in

the statement under threat of being charged with an offense. Later in his testimony, Ceasar denied having provided a statement. Ceasar wavered regarding whether he signed the statement; however, Ceasar identified his signature on the statement. The State read Ceasar's statement into the record. Ceasar then admitted stating that he saw a crowd moving down the street; that he saw defendant at the front of the group; and that he saw defendant discharge his handgun. Ceasar, however, said that his statement was untrue. Ceasar maintained that the police told him what to say. In the statement, Ceasar identified defendant as taller than the others in the group and wearing a red shirt.

Detective Michael Landando testified that neither Henry nor Ceasar was threatened in order to obtain a statement.

Assistant State's Attorney (ASA) Michael Clarke testified that he interviewed Smith, Gibbs, Henry, and Ceasar. ASA Clarke said all of the witnesses provided handwritten statements. Each witness signed each page of his or her statement. All of the witnesses reported that they were treated well by the police and that no threats or promises were made in exchange for their statements.

ASA Diana Garcia-Camilo testified that she examined Smith, Gibbs, and Henry before the grand jury. ASA Garcia-Camilo

testified that each witness identified defendant as the shooter. Moreover, each witness testified that no threats or promises were made by the State or the police. Henry never reported being threatened by the police.

Defendant was arrested at his home located two blocks from the scene of the shooting. Defendant is 6 feet 4 inches tall.

Three witnesses testified for the defense. Samuel Harris, Curtis Palmer, and Eric Harris all testified that they were "good friends" with defendant. Samuel testified that he was with his cousin Eric, defendant, "Roni," and "Terrell" on the night in question. Samuel had known defendant for 12 years. They learned that a fight was in progress and went to watch. Samuel said they saw Raper and the victim exchanging punches while a crowd was gathered nearby. Samuel was standing two houses away from the fight. Samuel reported seeing a flash from the crowd and hearing a gunshot. As a result, the group ran to safety approximately one block away. Samuel said the group remained together for an hour after they fled. Samuel testified that defendant was with him throughout the time in question and was not armed with a handgun. Samuel testified that he never reported what he observed to the police.

Palmer testified that he was with four or five friends on

the night in question.  Palmer had known defendant for over 10 years.  Later in his testimony, Palmer said he was with defendant, Samuel, and Eric, "[t]hat's about it."  The group went to observe a fight; however, due to his height, Palmer could not see anything.  Palmer reported that when he heard a gunshot defendant was standing next to him and did not have a handgun.  Palmer said he and defendant ran away after the gun was fired.  Palmer did not know whether Samuel ran with them.  The group met back together approximately one block from where the shooting took place.  Palmer remained with defendant at the meeting spot for 45 minutes or an hour.  Palmer never reported what he observed to the police because he "didn't want to get in the way of their work."

Eric testified that he was with Samuel, Palmer, defendant, "Roni," and "Terrance" while watching the fight between Raper and the victim.  Eric had known defendant for 10 years.  Eric reported seeing the victim run away and that a gunshot was fired from the crowd in front of his group.  Eric testified that defendant was standing directly in front of him when the shot was fired and did not have a gun in his hand.  Eric and the members of his group ran from the scene after the gunfire and remained together for 45 minutes or an hour.  Eric did not report what he observed to the police.

In closing, while instructing the jury, the court said:

"The defendant is presumed to be innocent of the charge against him.  The presumption remains with him throughout every stage of the proceedings *** every stage of trial and during your deliberations on the verdict and is not overcome unless from all the evidence in this case you are convinced beyond a reasonable doubt that he is guilty.

The State has the burden of proving the guilt of the defendant beyond a reasonable doubt and this burden remains on the State throughout the case.  The defendant is not required to prove his innocence.

The State has alleged that during the commission of the offense of first degree murder, the defendant personally discharged a firearm that proximately caused the death of another person.  The defendant is presumed to be innocent of this allegation.

This presumption remains with the defendant throughout every stage of the trial and during your deliberations on the verdict and is not overcome unless from all the evidence in this case you are convinced beyond a reasonable doubt that the allegation is

proven.

The State has the burden of proving the allegation beyond a reasonable doubt, and this burden remains on the State throughout the case. The defendant is not required to disprove the allegation.

The fact that the defendant did not testify must not be considered by you in any way in arriving at your verdict."

The jury found defendant guilty of first degree murder and that defendant personally discharged a firearm that caused the death of the victim. Defendant's motion for a new trial was denied.

The trial court sentenced defendant to an aggregate 60-year prison term, 35 years' imprisonment for the first degree murder conviction and 25 years' consecutive imprisonment for the firearm enhancement. Defendant's motion to reconsider his sentence was denied.

DECISION

I. Sufficiency of the Evidence

Defendant contends the evidence was insufficient to prove his guilt beyond a reasonable doubt where the State's evidence was unreliable.

1-08-1455

When reviewing a challenge to the sufficiency of the evidence, we must determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original.) Jackson v. Virginia, 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789 (1979). It is not the reviewing court's function to retry the defendant or substitute its judgment for that of the trial court. People v. Evans, 209 Ill. 2d 194, 209, 808 N.E.2d 939 (2004). The trial court assesses the credibility of the witnesses, determines the appropriate weight to be given to the testimony, and resolves conflicts or inconsistencies in the evidence. Evans, 209 Ill. 2d at 211. In order to overturn the trial court's judgment, the evidence must be "so unsatisfactory, improbable or implausible" to raise a reasonable doubt as to the defendant's guilt. People v. Slim, 127 Ill. 2d 302, 307, 537 N.E.2d 317 (1989).

A defendant is guilty of first degree murder[1] when the State proves beyond a reasonable doubt that, in performing the acts which cause the death of an individual:

---

[1]Defendant does not expressly challenge the jury's finding as to his personal discharge of a firearm.

-18-

> "(1) he either intends to kill *** that individual *** or knows that such acts will cause death to that individual ***; or

> (2) he knows that such acts create a strong probability of death *** to that individual ***; or

> (3) he is attempting or committing a forcible felony other than second degree murder."  720 ILCS 5/9-1(a)(1) through (3) (West 2002).

After reviewing the record, we find the evidence was sufficient to support defendant's conviction.  Six witnesses testified that they saw defendant shoot the victim.  Two of the six testified at trial that defendant was the shooter, while the remaining four witnesses were impeached with their handwritten statements identifying defendant as the shooter.  Three of the four witnesses impeached with their handwritten statements were also impeached with their grand jury testimony implicating defendant.  One of the witnesses that positively identified defendant at trial was defendant's cousin.  The other witness that identified defendant at trial was a woman who exited her home when she heard commotion outside on the street and then saw

defendant point and shoot his weapon at the victim as the victim attempted to run away.

"A single witness' identification of the accused is sufficient to sustain a conviction if the witness viewed the accused under circumstances permitting a positive identification." Slim, 127 Ill. 2d at 307. Generally, identification testimony is assessed pursuant to the factors announced in Neil v. Biggers, 409 U.S. 188, 34 L. Ed. 2d 401, 93 S. Ct. 375 (1972), which include: (1) the opportunity the witness had to view the offender at the time of the crime; (2) the degree of attention given by the witness; (3) the accuracy of the witness' prior description of the offender; (4) the level of certainty the witness demonstrated when identifying the perpetrator in person; and (5) the amount of time that lapsed between the crime and the in-person identification. Slim, 127 Ill. 2d at 307-08.

Defendant challenges Lloyd's identification, arguing it was unlikely Lloyd would have seen the shooter, whom she described as being within eight feet of her, because a person in a similar situation would have "at least instinctively covered her face" to protect against the gunshot. Lloyd, however, testified that she clearly saw defendant when he raised his revolver and shot the victim in the back of the head. Investigator William Moore

confirmed the likelihood that defendant used a revolver to shoot the victim because no discharged cartridges were found at the scene. According to Investigator Moore, cartridges are not discharged from revolvers; rather, cartridges remain in the cylinder of a revolver after the bullet is shot. Lloyd positively identified defendant in a photographic array on May 2, 2006, and positively identified defendant in a lineup on May 7, 2006, within days of the April 26, 2006, shooting. To the extent defendant infers from the unclear record that Lloyd provided a contradicting account of the victim's distance from her when he was shot, it was the jury's duty to resolve inconsistencies in the witness testimony. See Evans, 209 Ill. 2d at 211.

Defendant does not challenge the circumstances surrounding Raper's identification. Defendant, instead, challenges the reliability of Raper's trial testimony where he stated on cross-examination that his handwritten statement in which he identified defendant was coached by the police. We note, however, that on redirect examination Raper confirmed that his direct testimony identifying defendant as the shooter was accurate as given. Moreover, it was the jury's duty to assess Raper's credibility. See Evans, 209 Ill. 2d at 211. Therefore, the identification by Raper or Lloyd alone would be sufficient to sustain defendant's conviction.

As to the four witnesses that were impeached at trial, "[v]ariances between a witness' trial testimony and pretrial statements raise questions of credibility which the trier of fact must assess in making a determination of guilt." Slim, 127 Ill. 2d at 308. It was the jury's duty to resolve inconsistencies across the witnesses' testimony. Evans, 209 Ill. 2d at 211. The jury was entitled to believe that Smith, Gibbs, Henry, and Ceasar provided truthful handwritten statements shortly after the incident and that Smith, Gibbs, and Henry testified truthfully before the grand jury. Moreover, ASAs Clarke and Garcia-Camilo and Detective Landando refuted Henry's and Ceasar's testimony that they were threatened prior to making their statements.

Defendant contends that, contrary to the State's witnesses, the defense witnesses provided "strong" and "consistent" accounts of what transpired on the night in question. Defendant maintains that Samuel, Palmer, and Eric all presented credible testimony that defendant was with them while watching the fight between Raper and the victim. According to Samuel, Palmer, and Eric, defendant was standing next to them when a gun was discharged, but defendant was not armed. The jury, however, was not obligated to believe defendant's alibi over the State's witnesses, especially where Samuel, Palmer, and Eric each reported being defendant's "good" friend for 10 to 12 years, yet

1-08-1455

none came forward with his version of the events during the investigation.

We conclude that the evidence was not so unsatisfactory, improbable, or implausible to create a reasonable doubt regarding defendant's guilt. The evidence supported the jury's verdict.

II. Rule 431(b)

Defendant contends the trial court failed to comply with the mandates of Rule 431(b), and he, therefore, should be afforded a new trial. Defendant admits he did not object at trial or include the error in a posttrial motion (People v. Enoch, 122 Ill. 2d 176, 186, 522 N.E.2d 1124 (1988)); however, he contends that we should relax the rules of forfeiture and find plain error. The State responds that defendant failed to establish error. The State contends that, in the event we find error, this court should apply a harmless error analysis because a violation of Rule 431(b) is not a structural error requiring automatic reversal.

We review a trial court's compliance with a supreme court rule *de novo*. People v. Suarez, 224 Ill. 2d 37, 41-42, 862 N.E.2d 977 (2007).

We first address whether the trial court erred.

Supreme Court Rule 431(b) codified our supreme court's holding in People v. Zehr, 103 Ill. 2d 472, 477, 469 N.E.2d 1062

-23-

1-08-1455

(1984).  The rule was amended effective May 1, 2007, prior to the April 4, 2008, date jury selection began in this case.  See Official Reports Advance Sheet No. 8 (April 11, 2007), R. 431, eff. May 1, 2007.  The amended rule places a *sua sponte* duty on trial courts to ensure compliance with the mandates of Rule 431(b).  <u>People v. Thompson</u>, No. 109033, slip op. at 6 (October 21, 2010).  The amended rule provides:

> "The court *shall ask* each potential juror, individually or in a group, whether that juror *understands and accepts* the following principles: (1) that the defendant is presumed innocent of the charge(s) against him or her; (2) that before a defendant can be convicted the State must prove the defendant guilty beyond a reasonable doubt; (3) that the defendant is not required to offer any evidence on his or her own behalf; and (4) that the defendant's failure to testify cannot be held against him or her; however, no inquiry of a prospective juror shall be made into the defendant's failure to testify when the defendant objects.

> The court's method of inquiry *shall provide* each juror an *opportunity to respond* to specific questions concerning the principles set out in this section."

1-08-1455

(Emphasis added.)  Official Reports Advance Sheet No. 8
(April 11, 2007), R. 431(b), eff. May 1, 2007.
Supreme court rules are not aspirational; they must be "obeyed
and enforced as written."  Bright v. Dicke, 166 Ill. 2d 204, 210,
652 N.E.2d 275 (1995).

The trial court erred in this case by conducting a *voir dire*
that failed to fully comply with Rule 431(b).  Prior to
individually questioning the prospective jurors, the trial judge
provided three of the four Zehr principles, in narrative form.
The trial judge did not advise the prospective jurors that
defendant's decision not to testify could not be held against
him.  More importantly, the trial judge did not ask the venire
whether they understood or accepted any of the Zehr principles.
Much later in his opening remarks, the trial judge secured the
venire's understanding and acceptance of the State's burden of
proof.  The prospective jurors, however, were never given an
"opportunity to respond" to the remaining three Zehr principles.

While individually questioning a prospective juror from the
first venire, the trial judge turned his attention to the entire
first panel and asked whether they would follow the law regarding
the State's burden of proof "along with all the other law I give
you in the case?"  The venire responded in the positive.  Then,
although the judge seemingly addressed the entire first panel

-25-

when he stated that the defendant does not have to prove anything, the record does not reflect that the judge secured the venire's understanding and acceptance of this principle. Ten jurors were selected from the first panel.

While addressing the entire second panel, the trial judge asked whether the group understood and would follow "the law that I've been talking about all morning." The trial judge then specifically asked one of the two impaneled jurors whether he understood and accepted the law regarding the State's burden of proof. The juror responded in the positive.

Prior to swearing in the jury, the trial judge referenced the "rules of law" that were given during jury selection and secured that the jurors "remembered" and would follow "that along with all the other law" given in the case.

We find the trial court fell short of complying with Rule 431(b). The trial judge's narrative recitation of three of the four Zehr principles was not timely connected to specific questions providing the jurors with an opportunity to express their understanding and acceptance of those principles. People v. Wheeler, 399 Ill. App. 3d 869, 874, 927 N.E.2d 829 (2010). The trial judge only secured the jurors' understanding and acceptance of the Zehr principle regarding the State's burden of proof. The trial judge's questions as to whether the jurors

-26-

1-08-1455

would follow all of "the law" given was "a general question concerning the juror[s'] willingness to follow the law," which is a practice the rule sought to prohibit. 177 Ill. 2d R. 431(b), Committee Comments, at 1xxix. Our supreme court recently instructed:

> "Rule 431(b), therefore, mandates a specific question and response process. The trial court must ask each potential juror whether he or she understands and accepts each of the principles in the rule. The questioning may be performed either individually or in a group, but the rule requires an opportunity for a response from each prospective juror on their understanding and acceptance of those principles."
>
> Thompson, slip op. at 6.

Here, the trial court violated Rule 431(b).

Our court has been divided as to whether a harmless or plain error analysis is appropriate when such error is found. The supreme court's recent decision in Thompson, however, resolves the question regarding the impact of a Rule 431(b) violation.

In Thompson, the supreme court relied on its prior decision, People v. Glasper, 234 Ill. 2d 173 (2009), to conclude that a trial court's failure to comply with Rule 431(b) is not a structural error requiring automatic reversal. Thompson, slip

op. at 9-10. The supreme court recognized that the Glasper court was addressing the preamended version of Rule 431(b), which required Zehr questioning only when requested by the defendant; however, the court determined that the structural error discussion in Glasper equally applied to the amended Rule 431(b). Thompson, slip op. at 8-9. In relevant part, the supreme court reasoned that "[a]n error is typically designated as structural only if it necessarily renders a criminal trial fundamentally unfair or an unreliable means of determining guilt or innocence." Thompson, slip op. at 8. The supreme court found that a violation of Rule 431(b) does not necessarily result in a biased jury; rather, "Rule 431(b) questioning is simply one way of helping to ensure a fair and impartial jury." Thompson, slip op. at 9. The court added that "violation of [Rule 431(b)] does not necessarily render a trial fundamentally unfair or unreliable in determining guilt or innocence." Thompson, slip op. at 9. The supreme court concluded that where there is no evidence that a defendant was tried by a biased jury, a Rule 431(b) violation does not fall within the very limited category of structural errors requiring automatic reversal. Thompson, slip op. at 9-10.

Because there is no structural error for Rule 431(b) violations, we may review defendant's forfeited contention only if there was plain error. Thompson, slip op. at 10. As was the

-28-

case in Thompson, we find that the rules of forfeiture should not be relaxed in this case.  Pursuant to the Sprinkle doctrine, the rules of forfeiture may be relaxed only in extraordinary circumstances where a trial judge oversteps his authority in front of the jury or when counsel's objection would fall on deaf ears.  See Thompson, slip op. at 10.  There is no indication in the record that either circumstance existed here.  We, therefore, do not find it appropriate to relax the forfeiture rule.

Turning to the question of plain error, the plain error doctrine (134 Ill. 2d R. 615(a)) allows us to review an issue affecting substantial rights despite forfeiture in two instances:

"First, where the evidence in a case is so closely balanced that the jury's guilty verdict may have resulted from the error and not the evidence, a reviewing court may consider a forfeited error in order to preclude an argument that an innocent person was wrongly convicted. [Citation.] Second, where the error is so serious that defendant was denied a substantial right, and thus a fair trial, a reviewing court may consider a forfeited error in order to preserve the integrity of the judicial process."  People v. Herron, 215 Ill. 2d 167, 178-79, 830 N.E.2d 467 (2005).

Once it is determined that an error occurred at trial, the burden is on the defendant to establish plain error. Thompson, slip op. at 11.

The supreme court in Thompson reaffirmed the Glasper finding that the second prong of plain error review is equated with structural error. Thompson, slip op. at 12. Relying on the reasoning in Glasper, the Thompson court said a structural error is a systemic error that erodes the integrity of the judicial process and undermines the fairness of trial. Thompson, slip op. at 12, citing Glasper, 234 Ill. 2d at 197-98. The supreme court clarified that the 2007 amendment did "not indicate that compliance with the rule is now indispensable to a fair trial." Thompson, slip op. at 12. Moreover, "[a] violation of Rule 431(b) does not implicate a fundamental right or constitutional protection, but only involves a violation of [the supreme] court's rules." Thompson, slip op. at 13. The supreme court concluded that a defendant must demonstrate he was tried by a biased jury to establish under the second plain error prong that his right to a fair trial and the integrity of the judicial process were affected. Thompson, slip op. at 12.

Here, defendant challenges the trial court's Rule 431(b) error under both prongs of plain error. We first address defendant's second-prong attack in light of Thompson. The jury

was admonished and instructed on the Rule 431(b) principles. Although the jurors received some, but not all, of the Rule 431(b) questioning, defendant did not present any evidence demonstrating that the jury was biased. As a result, defendant failed to meet his burden of establishing that the trial court's error affected the fairness of his trial and challenged the integrity of the judicial process. Thompson, slip op. at 13. Therefore, there was no second-prong plain error.

Turning to defendant's first-prong attack, defendant contends the evidence was closely balanced because "the State called two unreliable witnesses who identified Brazziel from the stand, while the defense called three strong witnesses who testified Brazziel was not shooter" and the State's remaining occurrence witnesses did not "affirm their prior identifications." We recognize that the question of whether the evidence is closely balanced is distinct from a sufficiency of the evidence challenge. People v. Piatkowski, 225 Ill. 2d 551, 566, 830 N.E.2d 467 (2007). After reviewing the evidence, we find defendant failed to meet his burden of demonstrating that the evidence was closely balanced. On the contrary, we find that the strength of the evidence was overwhelming.

Two eyewitnesses, Raper and Floyd, identified defendant as the shooter. Raper testified against his cousin that he was next

to him when defendant shot the victim. Floyd testified that she was in front of her home within eight feet of defendant when he shot the victim. Four additional witnesses, Smith, Gibbs, Henry, and Ceasar, identified defendant as the shooter in handwritten statements given within days of the victim's murder, and Smith, Gibbs, and Henry also inculpated defendant before the grand jury. Although Smith, Gibbs, Henry, and Ceasar did not identify defendant as the shooter at trial, their prior statements were admitted as evidence. We conclude that defendant's forfeiture may not be excused based on the first prong of plain error.

III. Propriety of the State's Cross-examination and Rebuttal Argument

Defendant contends the State committed prosecutorial misconduct when the defense witnesses' moral character was attacked during cross-examination and highlighted by the State during rebuttal closing argument. The State responds that defendant forfeited review of this contention. In the alternative, the State contends its cross-examination of the defense witnesses and rebuttal closing argument were proper.

"Generally, cross-examination is limited in scope to the subject matter of direct examination of the witness and to matters affecting the credibility of the witness. [Citations.] However, this limitation is

construed liberally to allow inquiry into whatever

subject tends to explain, discredit, or destroy the

witness' direct testimony. [Citation.]" People v.

Terrell, 185 Ill. 2d 467, 498, 708 N.E.2d 309 (1998).

It is within the trial court's discretion to determine the

latitude to be given on cross-examination. People v. Hall, 195

Ill. 2d 1, 23, 743 N.E.2d 146 (2000). We will not interfere with

the trial court's decision unless the court clearly abused its

discretion such that there is manifest prejudice to the

defendant. Hall, 195 Ill. 2d at 23.

Defendant takes issue with certain portions of the State's

cross-examinations of the defense witnesses. In regard to the

cross-examination of Samuel, defendant challenges the following

exchange:

"Q. You don't--did you care that anybody could

have got shot over there?

A. Yes, I did care, but...

Q. You did care?

A. Mm-hmm.

Q. Because you're a caring person, right?

A. Yes.

Q. And you're such a caring person that if someone got shot, you would want to go tell the police what you saw, right?

DEFENSE COUNSEL: Objection.

THE COURT: Overruled.

A. Yeah.

Q. Okay. But you didn't?

A. No, because I was young.

Q. Even though there's police officers all over the place, right?

A. Yep.

Q. You could have walked up there and talked to one of the officers, right?

A. No. I was young.

Q. You were young?

A. Mm-hmm.

Q. So that stops you from talking to a police officer?

A. What was I gonna tell?"

As the cross-examination continued, Samuel admitted that, despite his knowledge that the police wrongly arrested defendant for the victim's murder, Samuel did not share this information with the police, the ASAs, any newspapers, or any television stations.

Defendant challenges the portion of Palmer's cross-examination after the State asked Palmer who he was with as he fled after the gunshot. Palmer maintained that the group of friends intended to meet back together; however, Palmer's primary focus was on getting himself to safety. In response, the State asked, "right, because you're really concerned ultimately about yourself, right." Defense counsel's objection was overruled and Palmer replied, "yes." Later, Palmer testified that he and defendant waited at the meeting place until the entire group arrived and then they went their separate ways. The State asked in response, "because you care about yourself, right?" Defense counsel objected and the objection was sustained.

During his cross-examination, Eric testified that it was not important to him to tell the police what occurred on the night in question. Defendant challenges the following exchange:

"Q. You didn't really care about anybody who got shot out there, right?

A. It wasn't none of my people.

Q. None of your people, right, so you really don't care about them?

A. I ain't saying I don't care about them. It wasn't none of my people.

Q. Who's your people?

DEFENSE COUNSEL: Objection.

A. My friends.

THE COURT: Overruled.

Q. So if some random guy gets shot, because he's not one of your people, you really don't care about him, right?

A. I didn't say I didn't care.

Q. Are you happy they got shot?

A. No, I'm not.

Q. Are you sad that they got shot?

A. No, I'm not.

Q. You just have no feelings whatsoever about it?

A. No, sir.

Q. So the boy that got shot over there, you have no feelings for whatsoever?

A. I never knew him."

In the two instances where the trial court overruled defense counsel's objections to the challenged cross-examination, we find the court did not abuse its discretion.  It is clear from the record that the State was eliciting testimony regarding the defense witnesses' credibility and bringing to light their bias. "Generally, any permissible kind of impeaching matter may be developed on cross-examination, since one of the purposes thereof

is to test the credibility of the witnesses." Hall, 195 Ill. 2d at 23. Defendant cannot demonstrate that he suffered manifest prejudice as a result of the latitude the trial court allowed in relation to the objected to cross-examination.

In regard to the challenged cross-examinations that defendant failed to preserve, we find the State did not engage in prosecutorial misconduct and, therefore, there was no error for purposes of defendant's suggested plain error analysis. See Enoch, 122 Ill. 2d at 186 (an error is forfeited when the defendant fails to lodge a contemporaneous object and does not include the alleged error in a posttrial motion). The State was not attacking the defense witnesses' morality or lack thereof; rather, the State attempted to undermine the witnesses' credibility by attacking the fact that none of the witnesses reported what occurred on the night in question or attempted to provide information to the authorities to exonerate defendant. The State further demonstrated the defense witnesses' bias by establishing that Palmer was most concerned about his safety and that of his group and that Eric's allegiance was to his group of friends. "The possible bias of a witness is always material, and relationship to a defendant is clearly a possible basis for bias." People v. Jones, 60 Ill. 2d 300, 306, 325 N.E.2d 601 (1975).

We find the cases cited by defendant in support of his argument that the State improperly questioned the defense witnesses' character are distinguishable. In People v. Rivera, 145 Ill. App. 3d 609, 495 N.E.2d 1088 (1986), the prosecutor improperly attempted to impeach a witness based on insinuation, not evidence in the record. Rivera, 145 Ill. App. 3d at 619-22. Here, the State attacked the witnesses credibility based on their direct testimony. In People v. Redmond, 50 Ill. 2d 313, 278 N.E.2d 766 (1972), the prosecutor improperly attacked the *defendant's* character unrelated to the crime charged. Redmond, 50 Ill. 2d at 315-16. In People v. Quick, 236 Ill. App. 3d 446, 603 N.E.2d 53 (1992), the prosecutor improperly attacked the *defendant's* religious beliefs when the direct examination was limited to testimony regarding the defendant's religious activities. Again, the State's attacks discredited the *witnesses'* direct testimony.

Defendant additionally challenges the following remarks made by the State during rebuttal argument:

"Well, let's talk about the defense witnesses because it's interesting how the defense characterizes those witnesses. It's interesting because apparently they are like three little angels. Oh, they say they work. Oh, they got kids. They got jobs. What they

don't have is credibility.  And you know why?  You heard them up there, three different stories.  Three different stories.

You know, it was Eric Harris that stated, and I think that basically sums up all three of those witnesses, he doesn't care about anybody but his friends.  The boy that got shot, doesn't care.  Didn't make him happy.  Didn't make him sad.  What a wonderful individual he is.  What a great guy.  What a great witness.

And that is why he testified for the defendant because he didn't care about anybody but the defendant.  That's why he got up there and did not tell you the truth, basically got up there and gave you a cockamamie story about how they're just like spectators at a football game, about a fight that they didn't know anything about.

***  Those witnesses were not credible whatsoever despite what counsel was saying about them.

* * *

That takes *** us to Eric Harris.  And once again, everything is summed up by this guy.  Doesn't care

about anybody but his people, his friends.  Guy got shot.  So what.  Doesn't care.  That's what he's about. ***

Credible testimony of witnesses came from Anthony Raper, came from Yolanda Floyd and came from handwritten statements and Grand Jury testimony of Lakesha Gibbs, Shontrice Smith, De[S]ean Henry and Johnny Ceasar.  That's where the credible testimony is, not with the defense witnesses who can't get their story straight, and basically can all be summed up by Eric Harris.  'I only care about my people.'  That's one of his people, a guy who shoots down Larry Brown in the head over a squabble with a girl.  That's the type of person he is."

A prosecutor is given wide latitude in making a closing argument.  People v. Nicholas, 218 Ill. 2d 104, 121, 842 N.E.2d 674 (2005).  During that argument, a prosecutor may comment on the evidence and any fair and reasonable inferences therefrom. Nicholas, 218 Ill. 2d at 121.  A closing argument must be reviewed in its entirety and the challenged comments must be viewed in context.  Nicholas, 218 Ill. 2d at 122.

As with the majority of the challenged cross-examination questions, defendant failed to object to the State's rebuttal.

Defendant, therefore, forfeited review of his contention.  See Enoch, 122 Ill. 2d at 186.  We emphasize that defense counsel was obligated to raise a contemporaneous objection because failure to do so prevented the trial court from having the opportunity to correct the alleged error immediately or to grant a mistrial. People v. McLaurin, 235 Ill. 2d 478, 488, 922 N.E.2d 344 (2009). Nevertheless, we find no plain error occurred.

After reviewing the State's rebuttal in its entirety, we find that the State's arguments were in direct relation to testimony elicited on cross-examination.  The State addressed the testimony of each defense witness.  Contrary to defendant's argument, the State was not attacking the witnesses' general moral character; rather, the State was arguing that the witnesses were not credible when they testified that they, along with defendant, were innocent observers of the victim's murder, yet none of them came forward to report what they observed or to proclaim defendant's innocence.  To the extent the State crossed the line of propriety when it facetiously called Eric Harris a "great guy," we find any error was cured when the jury was instructed at the end of trial that closing arguments were not evidence.  Nicholas, 218 Ill. 2d at 122-23.  The jury is presumed to have followed the law as given.  People v. Taylor, 166 Ill. 2d 414, 438, 655 N.E.2d 901 (1995).  Defendant, therefore, cannot

-41-

establish plain error where, as we previously determined, the evidence was not closely balanced and any minor error was not so serious as to affect the integrity of defendant's trial.

We further conclude that defendant cannot establish a claim for ineffective assistance of counsel. To demonstrate ineffective assistance of counsel, a defendant must show counsel's performance was deficient and such deficient performance caused substantial prejudice. Strickland v. Washington, 466 U.S. 668, 687, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064 (1984). To establish prejudice, a defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068. Even assuming, *arguendo*, defense counsel should have objected to all of the challenged cross-examination questions and rebuttal, the evidence overwhelmingly supported defendant's guilt and defendant cannot demonstrate that, but for the challenged questions and comments, the jury would have found him not guilty.

IV. Excessive Sentence

Defendant contends his sentence was excessive in light of mitigating factors, namely, his age and lack of a criminal record.

1-08-1455

A trial court's sentence may not be disturbed absent an abuse of discretion. <u>People v. Perruquet</u>, 68 Ill. 2d 149, 154, 368 N.E.2d 882 (1977). A sentence must be balanced between the seriousness of the offense at issue and the potential for the defendant's rehabilitation. See Ill. Const. 1970, art. I, §11. A trial court's sentence is entitled to great deference and weight because the trial court is in a superior position to make such a determination. <u>Perruquet</u>, 68 Ill. 2d at 154. The trial court weighs the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age. <u>People v. Stacey</u>, 193 Ill. 2d 203, 209, 737 N.E.2d 626 (2000). A reviewing court may not substitute its judgment for that of the trial court simply because it would have weighed those factors differently. <u>Stacey</u>, 193 Ill. 2d at 209. Moreover, a sentence within the statutory limits will not be considered excessive unless it greatly varies with the spirit and purpose of the law or is manifestly disproportionate to the nature of the offense. <u>Stacey</u>, 193 Ill. 2d at 210.

The trial court heard arguments in aggravation and mitigation. Prior to announcing defendant's sentence, the trial court said:

"I have reviewed closely the pre-sentence investigation. And in addition, I'm going to consider

what the Illinois State Legislature says I should consider, those statutory factors in aggravation and mitigation, in reaching my decision regarding what the number should be in this case.

* * *

As I said, the idea and the notion that one can point a gun at another person and fire it while that person runs away from you carries with it a full story of who that person that is firing is.

* * *

[Defense counsel] correctly points out that rehabilitation [is] a secondary aspect or another aspect that I'm considering. I am considering every one of those statutory obligations or considerations that I am asked to use. But it cannot be disputed that no conduct that he could have engaged in on that afternoon or early evening could have been worse than that which he did, which the jury found that he did.

It's for that reason that the sentence today will reflect the seriousness of this conduct. It will reflect the arguments in aggravation and mitigation of the attorneys, the statutory factors, and the pre-sentence investigation, everything."

A first degree murder conviction carries a sentence of not less than 20 years and not more than 60 years. 730 ILCS 5/5-8-1(a)(1) (West 2004). The firearm enhancement adds "25 years or up to a term of natural life" to the sentence. 730 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2004). Defendant's aggregate 60-year sentence, therefore, falls within the permissive statutory range.

The record clearly demonstrates that the trial court considered both the seriousness of the offense and defendant's potential for rehabilitation. The court repeatedly stated that it had taken into consideration defendant's presentence investigation report, the arguments in aggravation and mitigation, and the statutory factors while fashioning defendant's sentence. "The trial court has no obligation to recite and assign value to each factor presented at a sentencing hearing." People v. Hill, 402 Ill. App. 3d 920, 928, 932 N.E. 2d 173 (2010). Rather, "it is presumed that the trial court properly considered all mitigating factors and rehabilitative potential before it; and the burden is on the defendant to affirmatively show the contrary." People v. Garcia, 296 Ill. App. 3d 769, 781, 695 N.E.2d 1292 (1998). Defendant has failed to demonstrate the trial court abused its discretion.

We find that People v. Bolyard, 61 Ill. 2d 583, 338 N.E.2d 168 (1975), is distinguishable from the case at bar. In Bolyard,

the supreme court reversed and remanded the cause for resentencing after finding that the trial court abused its discretion when it denied a request for probation based on an expressed categorical belief that the defendant fell within the court's group of disfavored offenders. <u>Bolyard</u>, 61 Ill. 2d at 586-87. Here, the record demonstrates that the trial court considered the facts and circumstances of *this* case and did not simply apply a blanket policy. This court repeatedly has stated that the seriousness of the defendant's offense is the most important factor and the defendant's rehabilitation potential need not be given greater weight. <u>People v. Tye</u>, 323 Ill. App. 3d 872, 890, 753 N.E.2d 324 (2001).

CONCLUSION

We affirm defendant's conviction and sentence.

Affirmed.

HALL, P.J., and PATTI, J., concur.

1-08-1455

REPORTER OF DECISIONS - ILLINOIS APPELLATE COURT

---

THE PEOPLE OF THE STATE OF ILLINOIS,

Plaintiff-Appellee,

v.

JAMAEL BRAZZIEL,

Defendant-Appellant.

---

No. 1-08-1455

Appellate Court of Illinois

First District, FIRST DIVISION

November 22, 2010

---

Justice Bertina E. Lampkin authored the opinion of the court:

Presiding Justice Hall and Justice Patti concur.

---

Appeal from the Circuit Court of Cook County.

The Hon. Nicholas R. Ford, Judge Presiding.

---

**COUNSEL FOR APPELLANT**

Michael J. Pelletier, State Appellate Defender, Chicago, IL 60601

Patricia Unsinn, Deputy Defender

OF COUNSEL: Jonathan Krieger

**COUNSEL FOR APPELLEE**

Anita Alvarez, Cook County State's Attorney, Chicago, IL 60602

OF COUNSEL: Alan J. Spellberg, Michelle Fowler,

Rimas F. Cernius and Nancy Colletti

1-08-1455