2020 IL App (1st) 162515-U

No. 1-16-2515

Order filed March 5, 2020

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 14 CR 19486 |
| | ) | |
| SHAWANDA SWAIN, | ) | Honorable |
| | ) | Dennis J. Porter, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE LAMPKIN delivered the judgment of the court.
Presiding Justice Gordon and Justice Reyes concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The evidence was sufficient to support defendant's conviction for second degree murder despite her claim of self-defense and the trial court did not abuse its discretion when it imposed a 12-year sentence where it appropriately considered all factors in aggravation and mitigation.

¶ 2    Following a bench trial, defendant Shawanda Swain was convicted of second degree murder (720 ILCS 5/9-2(a)(2) (West 2014)) and sentenced to 12 years' imprisonment. On appeal, defendant contends the State failed to disprove beyond a reasonable doubt that she acted in self-

defense where the victim had exhibited abusive behavior toward her. She also argues her 12-year sentence was excessive based on the trial court's inappropriate consideration of letters attesting to the victim's character and its failure to properly weigh the mitigating factors. We affirm.[1]

¶ 3    Defendant was charged by indictment with two counts of first degree murder (720 ILCS 5/9-1(a)(1), (2) (West 2014)) for stabbing and killing Damani Chenier on October 9, 2014.

¶ 4    The evidence at trial showed defendant and Chenier had been in an on-again, off-again dating relationship. Chenier died of a stab wound to his chest on October 9, 2014. The medical examiner testified the blade had gone through Chenier's skin and the skeletal muscle of the chest, fractured his right rib, cut the right lower lobe of his lung causing a significant amount of blood in the chest cavity, and pierced his heart from front to back. The wound path appeared to be from right to left, from front to back, consistent with a downward right angle. It was the medical examiner's opinion that a "significant amount of force" would be necessary to drive the blade that deep into Chenier's chest and that the manner of death was homicide. Damage to the coat, shirt, and t-shirt submitted with Chenier corresponded with his chest wound and a knife having gone through them. Chenier's autopsy showed he was 5 feet, 10 inches tall, weighed 150 pounds, had no alcohol present in his toxicology report, and no defensive wounds.

¶ 5    The parties stipulated that, if called, Chicago police detective Burns would testify that he and Chicago police detective Robert Graves interviewed defendant at 4:40 a.m. on October 9, 2014, at a police station.[2] Burns would identify a copy of the electronically recorded interview (ERI) as a true and accurate audio and video recording of when defendant was being interviewed

---

[1] In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

[2] Detective Burns first name is not evident from the record on appeal.

and when she was alone in her cell. The recording was played in court. A second section of the recording was played during the testimony of Detective Graves, who testified the ERI was a true and accurate recording of what took place in the interview room shortly after 4:40 a.m. on October 9, 2014.

¶ 6    The ERI shows defendant told the detectives that she and Chenier had been drinking in her apartment when an argument started about their relationship.[3] Chenier got "physical with her," which had never happened before, and then tried to "calm her down" by grabbing her neck. They were drunk. Defendant told Chenier not to hit her again, but he hit her again in the face. She told Chenier she wanted him to leave, took his computer and guitar out of her apartment, and left them in the building vestibule. She was sad and upset about Chenier hitting her.

¶ 7    When defendant came back upstairs, Chenier was getting ready to leave and she told him his "stuff" was downstairs. They continued arguing. Chenier grabbed her arm, defendant "jerked away," and Chenier slapped her "real hard." Defendant cried and told Chenier that it was her place and he had to leave. Chenier talked to her, the fight died down and they began "a playful thing," where they were "play fighting" and wrestling. Chenier got a knife from a kitchen drawer and he and defendant were "playing" and "joking" that they would use the knife on each other. While playing, defendant grabbed the knife from Chenier. He took it out of her hand and put it down.

¶ 8    Defendant told the detectives she picked up the knife again and held it down by the side of her leg. Chenier did not know that she had the knife in her hand. As defendant was standing by the apartment door, Chenier "came into her really fast." Defendant did not know if Chenier was

_____

[3] It is unclear from the report of proceedings which portions of the ERI were played in court. This court therefore reviewed the entire recording.

coming to hug her. She felt threatened because of what had happened with Chenier earlier and he was coming at her fast. Defendant lifted the knife, Chenier "landed," and "the next thing [defendant] knew," Chenier was holding his chest. He then stepped back out of the open apartment door. Defendant started crying, saying "I'm so sorry baby," applying pressure to the wound and calling for help. She then knocked on doors, and her neighbor called the police.

¶ 9    Defendant stated that, because she had been drinking, she "could not think straight," did not put the knife down when Chenier came toward her, and did not realize what was happening. She told the detectives Chenier had hit her over "six or seven" times, but then clarified that number included times he grabbed her arm and that the hits to her face were "hard slapping." Defendant and Chenier had broken up and gotten back together numerous times. Before that night, Chenier had threatened and refused to leave and defendant had called police, but she made no police reports even though she had been in "fear for her physical safety."

¶ 10    Graves testified defendant was 5 foot, 6 inches tall and weighed approximately 130 pounds. During his interview, Graves did not observe any injury to defendant. Photos taken of her face and arms were admitted into evidence. They show no marks or injury. At the time of the interview, defendant did not know Chenier had died. Graves recovered surveillance from defendant's apartment building. The video, which was played in court, shows defendant placing a guitar in the vestibule, leaving, and then returning to place a laptop computer next to the guitar.

¶ 11    Sade Ragsdale testified that she lived across the hall from defendant. On October 9, 2014, at approximately 3:00 a.m., she was inside her apartment when she heard a door slam and someone frantically knocking on her door. Ragsdale went into the building's common hallway and saw a man lying on his back 10 feet from her door. Defendant, whom she recognized from the building,

was sitting astride him, pressing her hands on his chest. The man was groaning, trying to catch his breath, and looked like he was in pain. Defendant was worried, crying, and asking for help. She asked Ragsdale to call 911. While making the call, Ragsdale noticed the man had blood on his shirt and asked defendant what had happened. Defendant responded she did not know but also said "it was a suicide attempt." Ragsdale had not heard raised voices or fighting before the knocking on her door.

¶ 12    Chicago police detective Olson testified he was assigned to investigate Chenier's death.[4] In the vestibule of defendant's apartment building, he saw a guitar and laptop. Inside the doorway of defendant's apartment, he saw a knife on the floor and blood. Defendant's apartment was not in any kind of disarray, and Olson did not observe any alcohol or cups with alcohol in them. Outside the apartment were shoes and a jacket that belonged to Chenier. Olson identified photographs of the apartment showing the knife and blood on the floor. On cross-examination, Olson clarified he had only made a visual inspection of the apartment and had not opened drawers or anything of that nature.

¶ 13    The parties stipulated that, if called, police crime scene technician William Steck would testify that he took photographs of defendant's apartment and recovered and inventoried a knife, which he would identify in open court. All exhibits, including the knife, were admitted into evidence.

¶ 14    The State rested and defendant moved for a directed finding, which the trial court denied.

¶ 15    Isaac Malmgren testified he knew defendant through their church and met Chenier when he accompanied defendant. On July 27, 2014, defendant sent Malmgren a text message telling him

---

[4] Detective Olson's first name is not evident in the record on appeal.

that Chenier was threatening her life and asking him to "talk some sense into him."[5] In response, Malmgren sent a text message to an unknown phone number defendant gave him. He believed it was Chenier's number, and texted: "[defendant] says you're threatening her life you should stop or I'll call the cops and convince her to get a restraining order." The unknown number responded with "[w]ho are you," "[o]h you're the guy she's cheating on me with," and "[p]ray I don't see you in passing." An affidavit previously signed by Malmgren that contained the content of the text messages exchanged between defendant and Malmgren and between Malmgren and the unknown phone number was published. On cross-examination, Malmgren acknowledged he had lost contact with defendant about two months before the incident at issue.

¶ 16 Defendant testified she and Chenier started what became an on-again, off-again dating relationship in 2012. Defendant described Chenier as "very controlling" of her. He did not respect her "boundaries" when she had to go to work and school. Chenier occasionally stayed with defendant at her apartment and would leave personal items there, such as his guitar and laptop computer. In early 2014, defendant and Chenier argued regarding his crossing over defendant's boundaries and "aggressive behavior" toward her.

¶ 17 In February of 2014, defendant broke up with Chenier and advised him he could no longer stay at her apartment. Chenier, however, was "persistent," "calling *** constantly," "banging on [her] front door, telling [her] to 'open up or else' for hours on end." On February 16, 2014, at approximately 4:00 p.m., Chenier appeared at her apartment and prevented her from leaving. Defendant called the police twice seeking assistance, but they did not respond. On the morning of

___

[5] Over the State's hearsay objection, the court permitted Malmgren to testify to the content of the text messages solely for the purpose of showing defendant's state of mind regarding Chenier.

February 17, 2014, she was unable to go to work because Chenier was at her building. Defendant called the police again. An officer responded, escorted her out of the apartment, and gave her a ride to the bus stop so she could go to work. Defendant never made a police report about these incidents.

¶ 18    Over the next few months, defendant renewed her relationship with Chenier. They continued to argue, and defendant was "very much" disturbed thereby. Defendant broke up with Chenier again in July of 2014 and started seeing someone else. Chenier was "angry and belligerent" about the break-up. On July 27, 2014, Chenier called defendant, threatening "that this was going to be the last time that [she] broke up with him and *** that he was on his way to come and get [her]." Defendant felt afraid for her life. Defendant "called" Malmgren, who she knew from church, to see if he could "put some sense into" Chenier. Defendant gave Malmgren Chenier's phone number and asked him to send texts to Chenier. A few days afterward, defendant and Chenier reconciled when Chenier convinced her he did not mean what he said and would never hurt her.

¶ 19    Chenier continued to threaten defendant with harm during their fights. On occasions when defendant wanted Chenier to leave the apartment, Chenier would be aggressive and obstinate. Defendant would put his things downstairs in the building's lobby to "coax" him to leave. In September 2014, there was "a lot of argument, break up, back together" and defendant giving Chenier "chances" because she loved him.

¶ 20    On October 8, 2014, defendant and Chenier were watching a movie at her apartment and left to purchase food. They also purchased a bottle of Bacardi and a six-pack of beer before

returning to the apartment to resume watching the movie. Defendant and Chenier got into a verbal fight. Defendant left the apartment to take a breather. When she returned, another fight ensued.

¶ 21    Defendant testified Chenier told her, "You need to act f****** right or I'm gonna [*sic*] hurt you. I'm gonna [*sic*] hit you." Chenier approached her from behind, pushed her into the refrigerator, and grabbed her neck. Both their voices were raised. Defendant told Chenier to leave and "did what [she] usually [did] that works," which was to put his guitar and laptop downstairs in the building's vestibule. When she returned to the apartment, Chenier pulled her arm and threatened, "If you're breaking up with me and leaving me like this then I'm not gonna [*sic*] let anyone else have you. It's either me or no one and this will be the last day you'll see." Chenier told defendant "he would use [her] own knife to take [her] life."

¶ 22    Defendant "felt like [she] had to go retrieve that knife in order to protect [her]self," so she went to her kitchen drawer and got a knife. Chenier slapped her face, grabbed the knife from her, and threatened to kill her with it if she picked it up again. He told her if she insisted on breaking up with him, he was "gonna make sure [she] wasn't going to be with anyone else." Chenier put the knife down and defendant picked it up again because she felt "threatened for [her] life." Chenier was cursing at her. Defendant tried to calm Chenier down by trying to act in "a playful manner." Defendant told Chenier that she was "good," he was good, "[n]either one of [them] had to get hurt," and he just had to leave.

¶ 23    Chenier backed a foot out of the apartment's doorway without his jacket and shoes. Defendant was standing in front of him in the apartment, still holding the knife. Chenier's face then got "very angry and contorted in a monstrous way," and he came running at her, charging at her like he was going to tackle her. Defendant stabbed "at him" with an extended arm "to get him

away from [her]." Chenier removed his jacket or shirt and fell down. Defendant dropped the knife, put pressure on his wound, and started calling out for help and banging on doors. A neighbor called the police for her, and defendant was ultimately arrested.

¶ 24     On cross-examination, defendant acknowledged a photo showed Chenier's jacket and shoes outside in her hallway, and her testimony that he "wasn't wearing" his jacket and shoes. She testified Chenier would abruptly visit her, and try to control her. On February 16, 2014, he banged on her apartment door demanding she come out. Police did not respond to her call and she spent the night confined inside the apartment, "scared for [her] life." The next morning, she called the police again because Chenier was outside the vestibule door. Defendant admitted she never made a police report, stating she did not know that she could do so.

¶ 25     Defendant testified Chenier constantly threatened her, even during the periods of time when they were not dating. If they were not dating, she then was not afraid of his threats. When she texted Malmgren asking him to contact Chenier, she was not "genuinely scared."

¶ 26     Defendant explained she was in shock when she made the statement to police that she was being playful, but meant that she was trying to coax Chenier to leave the apartment. Defendant was not aware how much Chenier drank the night of October 8, 2014, but had seen him "pouring himself drinks." As she was putting her drink in the refrigerator, he ran over and started choking her. When he threatened to end her life, defendant got the knife. Chenier hit her in the face and took the knife from her. Defendant was holding the knife by its handle, so he must have taken it by the blade. Chenier threatened to kill her if she "tried it again," and he meant it.

¶ 27     Defendant picked up the knife again "for protection" but pretended to be calm, coaxing Chenier out of the apartment. Chenier backed out of the apartment door and, when he was in the

hallway, defendant went toward the door, planning to close it. Chenier then came toward her "in a tackle manner" and made a "monstrous, evil, mean face" like she had never seen before. Defendant was approximately six to seven feet from her. The force with which Chenier came at defendant was "very frightening" and defendant "felt completely helpless, threatened." She lifted up her hand to "stab him away from [her]," making a stabbing, jabbing motion forward. She knew immediately that she had stabbed him.

¶ 28    Defendant acknowledged telling the police that Chenier was not beating her, she was sad but not scared of him, he "ran into" the knife, she did not have her arm extended, she and Chenier were playing, and she was not sure he was not coming to give her a hug. She testified much of what she told the police was not truthful because "maybe somethings got jumbled up" that she now took the time to clarify at trial. Defendant stated the officers' questions were vague, she was in shock when she was answering them, and she was trying to protect Chenier during the interview because, if he survived, he would make her "suffer for it." She testified Chenier had hit her five or six times but she did not consider that "beating." Defendant acknowledged she knew that stabbing someone in the chest "with a knife that length" would seriously hurt or kill them.

¶ 29    On redirect examination, defendant identified a photograph of her apartment and noted that the plastic cups she and Chenier had bought and from which they were drinking were visible on top of her refrigerator. She also stated that, when she gave her statement to the police, her state of mind was "completely" cluttered, confused, and in shock.

¶ 30    On recross-examination, defendant stated she did not mean to kill Chenier and had acted in self-defense when he came at her in "a vicious manner" to attack her. When Chenier charged toward her "very aggressive and fast" and with a "contorted face" like he was going to tackle her,

he did not run into the knife and she did not stab him. Rather, she "plunged [the knife] towards him to poke him away from [her]" and he collided with her arm, which she had extended straight from her body. She immediately pulled the knife out because she did not want Chenier to die.

¶ 31    George Martin testified he lived directly below defendant. At approximately 2:30 a.m. on October 9, 2014, he was woken up by arguing and "rumbling" from the apartment above him. For the next 45 minutes, he heard arguing between a man and a woman but could not hear the exact words. At about 3 a.m., he heard a female voice yelling for help. Martin went upstairs and saw defendant straddling a man, who was laying on his back in the hallway. Defendant was saying "baby, baby, *** please don't go." She looked up and said, "[W]e had a fight; it was an accident." Martin knew defendant from having seen her in the building. He had seen Chenier at the building on two or three prior occasions. On each of those occasions, police were talking to Chenier and apparently telling him to leave while defendant stood to the side.

¶ 32    Over the State's objection, defendant offered records into evidence and then published the records from the Office of Emergency Management and Communication indicating that it received calls from defendant on February 16 and 17, 2014.

¶ 33    In closing, defendant argued she suffered from battered woman syndrome, mental abuse, and threats of physical abuse by Chenier that built up over a long period of time. On the night of the murder, Chenier slapped her, grabbed her throat, and threatened to kill her. Defendant had the knife because she felt threatened. When Chenier came at her, she thought he was coming to get her and stabbed him, thinking it necessary to prevent the serious bodily harm he threatened to inflict upon her. Defendant argued Chenier continued to be the aggressor even though she had already tried to defuse the situation, and that she had no other recourse. The State argued in rebuttal

that defendant not only intended to kill Chenier but her actions were not justified as she was not genuinely afraid Chenier would ever cause her harm.

¶ 34    The trial court found defendant not guilty of intentional first-degree murder (720 ILCS 5/9-1(a)(1) (West 2014)) on count 1, but guilty of second-degree murder on count 2. It found the State proved defendant committed first degree murder by stabbing Chenier in the heart with a knife knowing it would cause death or great bodily harm and that the evidence did not support the stabbing was an accident. The court nevertheless reduced the offense to second degree murder, finding defendant established imperfect self-defense. The court told defendant, in relevant part,

> "With specifically the defendant's credibility, I find it very difficult to give much weight to almost anything you say, Ms. Swain, because of the fact that each and every time you are asked about this you tell a different story, in some cases it's radically different, and I don't think you can get away from that. That's the state of the evidence in this case.
>
> I did not get the feeling that anyone else was trying color their testimony in any way, shape, or form, with the exception of you. So with regard to facts that have to be submitted by your evidence, I would look for corroboration to either rebut or confirm your statements.
>
> It is clear to me from the evidence in the case that the [S]tate has proved, at the very least *** that the victim's death was caused by you stabbing him in the heart *** [and] that this act was done knowingly, if not intentionally.
>
> It's beyond argument really that stabbing somebody in the heart with a knife, that someone knows it will cause death or great bodily harm. The [S]tate has proven first degree murder beyond a reasonable doubt."

¶ 35 The trial court found no evidence defendant stabbed Chenier by accident. It then addressed defendant's self-defense claim at length, reviewing each of the ten factors enumerated in *People v. Evans*, 259 Ill. App. 3d 195, 210 (1994), and concluding defendant's actions were neither reasonable and nor necessary to prevent imminent death or great bodily harm. The court found that, although defendant was afraid of Chenier, the evidence was "not such that *** [she] would resort to a deadly weapon." It found no question that defendant was afraid as she called the police but, "as far as her being battered," any abuse was more verbal than physical. The court held the evidence showed Chenier was sober, defendant's assertion that she and Chenier had been drinking was unsupported, the argument was over as defendant had calmed Chenier down, and defendant had an opportunity to escape. It found it unclear there was an attack by Chenier, as defendant was not even sure why Chenier was coming at her – perhaps to hug her – and the only evidence regarding the attack came from defendant's uncorroborated testimony.

¶ 36 The court concluded,

> "it is clear there was an argument going on from the testimony of the neighbor who lived downstairs. It's clear that she wanted him out; it's clear that he was not out. So taking all of this I think the defense has established what is called imperfect self-defense, that is she thought she was justified in doing that which she did but her belief was unreasonable."

The court therefore found defendant guilty of second degree murder.

¶ 37 Defendant filed a motion for new trial arguing the State had not proved her guilty of second-degree murder beyond a reasonable doubt because it did not prove she had not acted in self-defense. The court denied the motion without comment and proceeded to sentencing.

¶ 38    Defendant's presentence investigation (PSI) report indicated she had no prior criminal record. She was raised by her single mother, who worked as a nurse, and reported a "decent" childhood and a very close relationship with her maternal half-sister. Defendant attended a public school until the sixth grade, when her mother began home schooling her and her sister. She graduated high school and began attending Harold Washington College full-time in 2012, while also working. Defendant denied gang affiliations, was in good physical and mental health until she was incarcerated, and was now diagnosed with depression and anxiety. She reported only social drinking, marijuana experimentation in her teens, and no use of any other illegal drugs.

¶ 39    At the sentencing hearing, the State presented a victim impact statement from Chenier's grandmother and letters written by Chenier's family and friends. Defense counsel objected to certain letters because they contained hearsay statements which "amount[ed] to evidence of other crimes" by defendant. The State withdrew those letters and defense counsel then stated, "with those withdrawals, now we have no objections to either the victim impact or the letters." The trial court reviewed the letters submitted on behalf of Chenier, as well as letters submitted on behalf of defendant.

¶ 40    In aggravation, the State argued a substantial sentence was necessary to deter others from believing that they could commit the same act, and that defendant was not remorseful and therefore needed to be held accountable. In mitigation, defense counsel argued defendant had acted atypically as she came from a good background, had no criminal record, was in school, and was working. Counsel argued defendant felt threatened by Chenier on different occasions, which led to her state of mind on the date of the incident, she had not planned to kill him that day, and she was capable of contributing to society if allowed to make amends.

¶ 41    In allocution, defendant stated she wanted to bring Chenier back, "if not for me, but for his family." She repented for her sins, "first to God and second to my boyfriend's mom and grandmother and the rest of his family," and took full responsibility for her actions. Defendant requested "mercy" in order to enjoy her family and friends again and reintegrate her "skills and gifts into society."

¶ 42    The trial court sentenced defendant to 12 years' imprisonment. Noting it was "highly unusual" that defendant had no prior record, the court found the sentence was necessary to deter others from committing the same offense. The court told defendant,

> "I find myself in a very unusual situation here. And that is, as your lawyer pointed out, two people who outwardly are just two regular people minding their own business and not committing crimes, all of a sudden find themselves in this position where one is dead and the other one has killed that person.
>
> For all it appears from the letters and support of the victim impact statement of the deceased, he had no prior record either. He was active in his church. He was a mentor to others. And yet here we find something going on that winds up in his death.
>
> I also want you to know that I consider your conduct in this case considerab[ly] closer to first degree murder than to *** a justifiable killing, quite frankly. The number of different renditions of what happened that you have given convinces me that I may not have heard the exact truth from you in any of them, quite frankly.
>
> *** I cannot ignore the fact that *** you have some serious factors in mitigation in your *** favor, not insignificantly being your no prior record."

The trial court stated that, having considered the nature and circumstances of the offense, defendant's character and background, counsels' arguments, defendant's statements, the PSI report, and the statutory aggravation and mitigation factors, it sentenced defendant to 12 years in prison. The court subsequently denied defendant's motion to reconsider sentence.

¶ 43    On appeal, defendant first contends her conviction should be vacated because the State did not prove beyond a reasonable doubt that her actions were not justified self-defense, where witnesses' accounts corroborate her testimony that she was a victim of abuse and Chenier threatened to kill her on the night of the incident.

¶ 44    A challenge to the sufficiency of the evidence requires the reviewing court to consider whether, viewing the evidence in the light most favorable to the State, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Internal quotation marks omitted.) *People v. Gray*, 2017 IL 120958, ¶ 35. The trier of fact resolves "conflicts in the testimony, weigh[s] the evidence, and draw[s] reasonable inferences from the facts." *Id*. "[A] court of review will not substitute its judgment for that of the trier of fact on questions involving the weight of the evidence or the credibility of the witnesses." *Id.* The trial court's judgment will not be reversed "unless the evidence is so unreasonable, improbable, or unsatisfactory as to create a reasonable doubt of the defendant's guilt." *People v. Newton*, 2018 IL 122958, ¶ 24.

¶ 45    Here, defendant was charged with first degree murder, raised the affirmative defense of self-defense, and was convicted of second-degree murder. As relevant here, a person commits second-degree murder when she commits the offense of first degree murder and, at the time of the killing, "believes the circumstances to be such that, if they existed, would justify or exonerate the

killing *** but *** her belief is unreasonable." 720 ILCS 5/9-2(a)(2) (West 2014). This form of second-degree murder is known as imperfect self-defense, and " 'occurs when there is sufficient evidence that the defendant believed [s]he was acting in self-defense, but that belief is objectively unreasonable.' " *People v. Castellano*, 2015 IL App (1st) 133874, ¶ 148 (quoting *People v. Jeffries*, 164 Ill. 2d 104, 113 (1995)).

¶ 46    A person commits first degree murder as charged here when she kills an individual without lawful justification and, in performing the acts which cause the death, knows that such acts create a strong probability of death or great bodily harm to that individual. 720 ILCS 5/9-1(a)(2) (West 2014). Self-defense is an affirmative defense and a lawful justification for first degree murder, as a person is justified in the use of deadly force if she reasonably believed that the force was necessary to prevent imminent death or great bodily harm. 720 ILCS 5/7-1 (West 2014); *Jeffries*, 164 Ill. 2d at 127.

¶ 47    To raise the defense, the defendant must provide some evidence of each of the following elements: (1) unlawful force was threatened against a person; (2) the person threatened was not the aggressor; (3) the danger of harm was imminent; (4) the use of force was necessary; (5) the person threatened actually and subjectively believed a danger existed that required the use of the force applied; and (6) the beliefs of the person threatened were objectively reasonable. 720 ILCS 5/7-1 (West 2014); see also *People v. Lee*, 213 Ill. 2d 218, 224 (2004). Once the defendant has met her burden, the burden of proof shifts to the State to prove beyond a reasonable doubt not only that the defendant is guilty of first degree murder, but that she did not act in self-defense. *Jeffries*, 164 Ill. 2d at 114, 127. The State carries its burden if it negates any one of the elements of self-defense beyond a reasonable doubt. *Id.* at 128.

¶ 48    Defendant does not dispute she stabbed and killed Chenier. Rather, she maintains, as she did at trial, that she was acting in self-defense when she stabbed him, that she was justified in using the knife to protect herself against him. The trial court found defendant believed she needed to defend herself by stabbing Chenier but that her belief was unreasonable, *i.e.*, that the State negated the sixth element of self-defense. The question here is whether any rational trier of fact could have reached that determination. The reasonableness of defendant's belief that the use of deadly force was necessary depends on the surrounding facts and circumstances and is a question of fact. *People v. Rodriguez*, 336 Ill. App. 3d 1, 15 (2002). Thus, in weighing the evidence, the court must consider the probability or improbability of the testimony, the circumstances surrounding the killing, and the testimony of other witnesses. *Id.*

¶ 49    Viewing the evidence in the light most favorable to the State as we must, we find a rational trier of fact could have found the State proved beyond a reasonable doubt that defendant's belief that she was acting in self-defense when she stabbed Chenier was unreasonable. As the trial court concluded, there was evidence that defendant was afraid of Chenier. Defendant, who was smaller than Chenier, testified to an extensive history of verbal abuse and that, prior to the stabbing, he hit her, grabbed her by the throat, threatened to kill her with the knife, and told her "this will be the last day you'll see." In defendant's recorded interview with detectives, she told them Chenier hit her several times, and Martin testified to hearing an argument in defendant's apartment before the stabbing. But, as the trial court also noted, the evidence further showed that argument was over when the unarmed Chenier ran at defendant and it was unclear whether Chenier was attacking her when he ran at her, as even defendant did not know whether he intended to hug her.

¶ 50    At trial, defendant claimed she grabbed the knife because she wanted to protect herself, Chenier disarmed her and put the knife down, and defendant picked it up again because she feared for her life. She testified she calmed Chenier down and he backed up toward the apartment's doorway but he then charged toward her with a face that was "contorted in a monstrous way." Defendant testified she felt helpless and threatened, and stabbed "at him" with an extended arm "to get him away from [her]," jabbing at him. This version of events is contradicted by what defendant told the detectives: after the altercation between defendant and Chenier died down, they played and joked with the knife, he came toward her perhaps to hug her, he did not know she had the knife, and he accidently ran into it when she lifted it up.

¶ 51    Further, defendant's testimony that she extended her arm out from her body and stabbed/jabbed at Chenier to get him away from her is contradicted by the medical examiner's testimony that, in order for the blade to have pierced Chenier's heart from right to left, front to back, from a downward angle, a "significant" amount of force was needed. Defendant's testimony that Chenier slapped and choked her shortly before the stabbing is contradicted by Detective Graves' testimony that he saw no injuries to defendant and by the photographs taken of defendant's face and arms at the police station that night show no injuries. Defendant's testimony that Chenier had been drinking was contradicted by the toxicology report finding no alcohol his system.

¶ 52    The court found it "very difficult to give much weight to almost anything" defendant said unless her testimony was otherwise corroborated, and we defer to that credibility determination. *Gray*, 2017 IL 120958, ¶ 35. Presented with conflicting versions of events, the court did not need to accept as true defendant's assertion that she feared for her life when she stabbed Chenier; it was entitled to choose between the competing versions. See *People v. Villareal*, 198 Ill. 2d 209, 231

(2001). Accordingly, a rational trier of fact could conclude the State proved beyond a reasonable doubt that defendant's use of force was unreasonable and excessive, thus warranting rejection of her claim of self-defense. See *Jeffries*, 164 Ill. 2d at 128 (holding that "[i]f the State negates any one of the self-defense elements, the defendant's claim of self-defense must fail").

¶ 53    Defendant next contends that the trial court abused its discretion when it imposed a 12-year sentence because it improperly considered evidence regarding Chenier's personal traits in aggravation and failed to adequately consider her potential for rehabilitation, lack of criminal background, strong family and community ties, and educational pursuits in mitigation.

¶ 54    When sentencing a defendant, "the trial court has broad discretionary powers." *People v. Stacey*, 193 Ill. 2d 203, 209 (2000). Substantial deference is given to the trial court because "the trial judge, having observed the defendant and the proceedings, is in a much better position to consider factors such as the defendant's credibility, demeanor, moral character, mentality, environment, habits, and age." *People v. Snyder*, 2011 IL 111382, ¶ 36. A reviewing court "must not substitute its judgment for that of the trial court merely because it would have weighed these factors differently." *People v. Alexander*, 239 Ill. 2d 205, 212 (2010).

¶ 55    When a sentence falls within statutory guidelines, it is presumed proper. *People v. Knox*, 2014 IL App (1st) 120349, ¶ 46. Second degree murder is a Class 1 felony (720 ILCS 5/9-2(d) (West 2014)) with a sentencing range of 4 to 20 years (730 ILCS 5/5-4.5-30(a) (West 2014)). Because defendant's 12-year sentence falls within these statutory guidelines, we must presume it is proper. *Knox*, 2014 IL App (1st) 120349, ¶ 46.

¶ 56    Nevertheless, defendant contends that the sentence is excessive as the trial court improperly relied in aggravation on in excess of 15 letters from family, friends, and community members

attesting to Chenier's good character. Defendant concedes that she forfeited this issue by not objecting at trial or raising it in a posttrial motion (see *People v. Kitch*, 239 Ill. 2d 452, 460-61 (2011)), but posits that we can review it as plain error. Additionally, defendant argues that trial counsel was ineffective for failing to preserve the error.

¶ 57    The plain error doctrine is a "narrow and limited exception" to the general forfeiture rule. *People v. Hillier*, 237 Ill. 2d 539, 545 (2010). Pursuant to the doctrine, a reviewing court may address forfeited claims where a clear or obvious error occurred and "(1) the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error," or "(2) that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." (Internal quotation marks omitted.) *People v. Harvey*, 2018 IL 122325, ¶ 15. A defendant must first show that a clear or obvious error occurred to obtain relief under this rule. *Hillier*, 237 Ill. 2d at 545.

¶ 58    At sentencing, the trial court admitted a victim impact statement from Chenier's grandmother as well as in excess of 15 letters from, *inter alia*, Chenier's cousin, aunt, pastors, friends, and community members. The court may consider a crime's specific harm – the "impact" of the victim's death – at sentencing. *People v. Mauricio*, 2014 IL App (2d) 121340, ¶ 19. Thus victim-impact evidence is admissible at sentencing, and the court may allow persons impacted by the crime who are not victims to present an oral or written statement. 725 ILCS 120/6(a) (West 2016). However, although the court may rely on such evidence "insofar as it pertains to the specific harm caused by the crime," it "may not rely on the victim's mere status" as demonstrating that "defendants whose victims were assets to their community are more deserving of punishment than

those whose victims are perceived to be less worthy." *Mauricio*, 2014 IL App (2d) 121340, ¶ 19. Thus, personal traits of victims are not relevant to the question of the proper sentence to be imposed. *People v. Joe*, 207 Ill. App. 3d at 1087 (citing *People v. Walker*, 109 Ill.2d 484, 505 (1985), *cert. denied* 479 U.S. 995 (1986)).

¶ 59    Defendant argues the court relied on an improper sentencing factor by considering Chenier's personal traits as set forth in the letters submitted in aggravation. The trial court's consideration of an improper factor in aggravation when imposing a sentence is an abuse of discretion. *People v. Minter*, 2015 IL App (1st) 120958, ¶ 147. However, the issue of whether the court considered an improper sentencing factor is a question of law reviewed *de novo*. *People v. Bowen*, 2015 IL App (1st) 132046, ¶ 49. It is the defendant's burden to affirmatively show the sentence was based on improper considerations, and we will not reverse a sentence imposed by a trial court unless it is clearly evident the sentence was improperly imposed. *Id.*

¶ 60    We do not find it clearly evident that the trial court improperly relied on Chenier's personal traits in sentencing defendant to 12 years in prison. The letters did mention Chenier's personal traits, variously describing him as gentle, thoughtful, honest, and responsible, and having "calmness of spirit, intelligence, as well as a strong sense of duty to family and his community." However, these references were generally made in the context of Chenier's volunteering at church and in elementary tutoring programs, mentoring younger teens in the Rosemoor Community Association, feeding the hungry at his church, and acting as a big brother to an autistic boy from his neighborhood. The letters spoke to Chenier's being missed, *i.e.*, the impact his death had on his community, which is a proper consideration at sentencing. See *Mauricio*, 2014 IL App (2d) 121340, ¶ 19.

¶ 61    Further, although the court stated it had read all the letters, this does not mean it was influenced by any improper matters in those letters. A court of review will presume the sentencing court relied only on proper evidence unless defendant affirmatively shows otherwise. *People v. Trimble*, 220 Ill. App. 3d 338, 353 (1991) (even where improper evidence is presented, the reviewing court will presume the trial court, knowing the law, disregarded the improper evidence and considered only proper evidence in imposing sentence). Defendant has not done so here where the trial court's sole mention of the letters was as follows: "[f]or all it appears from the letters and support of the victim impact statement of the deceased, he had no prior record either. He was active in his church. He was a mentor to others. And yet here we find something going on that winds up in his death." Nothing in this cursory comment shows the court improperly considered Chenier's personal traits rather than the impact of his death at sentencing.

¶ 62    Nor does the court's comment show the weight the court placed on the information in the letters was so significant that it led to a greater sentence. See *People v. Heider*, 231 Ill. 2d 1, 21 (2008) (sentence based on an improper factor may be affirmed where review of the record "establishes that the weight placed on the improperly considered aggravating factor was so insignificant that it did not lead to a greater sentence"). Rather, the court's extensive discussion of defendant's lack of criminal background, her ties to the community, her educational pursuits, and the inexplicability of her being charged with murder shows this was the basis for its sentence, not the fact that Chenier was active in church and a mentor to youth. In sum, we find defendant failed to show clear error in the court's consideration of the letters submitted in aggravation. As there is no error, there can be no plain error and counsel was not ineffective for failing to preserve the alleged error. See *People v. Moon*, 2019 IL App (1st) 161573, ¶¶ 46-7.

¶ 63    Defendant lastly argues her sentence was excessive where the trial court failed to adequately consider her rehabilitative potential, age, lack of criminal background, work and social history in mitigation. At sentencing, the trial court must balance "the seriousness of the offense" and "the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11; *People v. Wilson*, 2012 IL App (1st) 101038, ¶ 61. However, a defendant's rehabilitative potential is not entitled to greater weight than the seriousness of the offense (*People v. Reed*, 2018 IL App (1st) 160609, ¶ 62) and "the presence of mitigating factors requires neither a minimum sentence nor precludes a maximum sentence." *People v. Jones*, 2014 IL App (1st) 120927, ¶ 55.

¶ 64    When considering a sentence's propriety, "the reviewing court *** must not substitute its judgment for that of the trial court merely because it would have weighed the factors differently." *People v. Fern*, 189 Ill. 2d 48, 53 (1999). The trial court is not required to expressly outline its reasoning for sentencing, and we presume that the court considered all mitigating factors and the defendant's rehabilitative potential unless the defendant makes an affirmative showing to the contrary. *People v. Jones*, 2014 IL App (1st) 120927, ¶ 55; *People v. Brazziel*, 406 Ill. App. 3d 412, 434 (2010).

¶ 65    Defendant does not make that affirmative showing here. Defendant's potential for rehabilitation, lack of criminal background, strong family and community ties, and educational pursuits in mitigation were before the court and we presume it considered this mitigation evidence. *Brazziel*, 406 Ill. App. 3d at 434. Further, the record shows the trial court specifically stated it had considered the nature and circumstances of the offense, defendant's character and background, counsels' arguments, defendant's statements, the PSI report, and the statutory aggravation and mitigation factors before sentencing. It discussed defendant's lack of criminal background at

length, and stated defendant was "apparently a productive member of society. She had a job on occasion. She worked and was active in her church." The court commented it found itself in a very unusual situation because both victim and defendant were "two regular people minding their own business and not committing crimes" prior to the incident at issue. In short, the record shows the court properly considered all mitigating factors. It was not required to give more weight to the mitigating evidence than to the seriousness of the offense, in which defendant stabbed Chernier with so much force that she punctured his heart from front to back. See *Reed*, 2018 IL App (1st) 160609, ¶ 62. Accordingly, we find the trial court did not abuse its discretion in sentencing defendant to 12 years' imprisonment.

¶ 66    For the foregoing reasons, we find the evidence supported defendant's conviction for second degree murder and the trial court did not abuse its discretion when it imposed a 12-year sentence. The judgment of the trial court is affirmed.

¶ 67    Affirmed.