2020 IL App (1st) 173000-U

No. 1-17-3000

Order filed December 31, 2020

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 11 CR 13615 |
| | ) | |
| LARON THOMAS, | ) | Honorable |
| | ) | Thomas V. Gainer Jr., |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE LAMPKIN delivered the judgment of the court.
Presiding Justice Gordon and Justice Reyes concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The evidence was sufficient to support defendant's conviction for second degree murder despite his claim of self-defense, and the trial court did not abuse its discretion when it imposed a 15-year sentence after appropriately considering the evidence in aggravation and mitigation.

¶ 2    Following a bench trial, defendant Laron Thomas was found guilty of two counts of second degree murder (720 ILCS 5/9-2(a)(2) (West 2010)). The trial court merged the counts and sentenced defendant to 15 years in prison. On appeal, defendant contends that his conviction

should be reversed when the State failed to disprove beyond a reasonable doubt that his actions constituted a lawful and justified use of force. He further contends that his 15-year sentence is excessive considering he had "almost no criminal history." We affirm.[1]

¶ 3     Defendant was charged with six counts of first degree murder (720 ILCS 5/9-1(a)(1), (2) (West 2010)) arising from the shooting death of Reggie "BC" Coles on July 17, 2010.

¶ 4     At trial, Charles "P Lord" Mallett testified that he was serving a seven-year sentence for "narcotics offenses." When Mallett entered a guilty plea in that case, he did not ask his attorney to negotiate that plea in exchange for his testimony in this case. Coles was Mallet's best friend. In 2010, Mallett worked as a drug dealer, but did not carry a firearm to avoid "heat." Coles supplied drugs, and another man, Marshune Miller, was a former employee.

¶ 5     On the evening of July 16, 2010, Mallett and Coles went to a basketball tournament at Delano Elementary School (Delano). Around midnight, they noticed defendant standing by a fence. Between a week-and-a-half to two weeks prior, Mallett and defendant had "words." Coles walked to defendant and said, "what's up." At that point, defendant drew a pistol and held it by his side. Coles, who was unarmed, again said "what's up." Defendant then shot Coles, who fell to the ground. When Mallett approached Coles's body, he did not see any weapons. Mallett spoke to police on September 26, 2010, and identified defendant as the shooter in a lineup on July 24, 2011.

¶ 6     During cross-examination, Mallett acknowledged being present a few days before the shooting when defendant and Coles "had some words." On the night of the shooting, when Coles

---

[1] In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

approached defendant, defendant drew a firearm. Mallett denied handing Coles a firearm or taking one from Coles after the shooting.

¶ 7      Miller testified that he had prior convictions for possession of a controlled substance with intent to deliver and possession of a controlled substance. He had known Coles his entire life. When Miller arrived at Delano in the late evening of July 16, 2010, he saw Coles and Mallett by the basketball court and defendant standing outside a gate. At one point, Miller heard a gunshot, looked up, and saw defendant running with a firearm in his hand. Miller turned and saw Coles fall, but did not see him with a firearm. Miller did not speak to the police that night because he had an outstanding warrant in the system for his arrest. On September 26, 2010, he spoke to officers and identified defendant in a photographic array.

¶ 8      During cross-examination, Miller acknowledged that he did not see defendant shoot anyone; rather, he heard the gunshot. Defendant was around 20 feet away when Miller saw him running. Miller knew Coles from the neighborhood and denied selling drugs for him.

¶ 9      Laqueta Brown testified that she grew up in the same neighborhood as defendant and Coles and was at trial pursuant to a subpoena. Shortly after midnight on July 17, 2010, she saw defendant and Coles "having words" and heard defendant say, "[y]ou don't have your gun now." She then heard a gunshot. Although Brown saw defendant with a firearm, she did not see him fire it; rather, she only heard the gunshot. She did not see Coles or Mallett with a firearm and did not see Mallett take anything from Coles. When the police arrived after the shooting, Brown did not speak to them. On September 26, 2010, she spoke to detectives and identified defendant in a photographic array as the person with a firearm. She later identified defendant in a line-up and testified before a grand jury.

¶ 10 After Brown further testified she did not see defendant point a firearm at Coles, the State asked whether she testified before the grand jury that she saw defendant with his hand up. Brown replied that when the State "just showed me that back there," she "didn't remember." However, she reiterated she did not see defendant shoot the firearm. The State next asked whether, during a videotaped statement given several months after the shooting, Brown said she saw defendant discharge a firearm. Brown remembered saying that she saw the firearm in defendant's hand, but not that he pointed it.

¶ 11 During cross-examination, Brown testified that she saw Coles every day except for the six years he was in prison. On the night of the shooting, defendant spoke to Coles for 7 to 10 minutes and Mallett was "right there." After seeing defendant draw a firearm, she looked away. Two minutes later, she heard a gunshot. She did not know that Coles and Mallett were drug dealers. Brown shared a child with Coles's brother and spoke to the police only after Mallett told her to do so. During redirect, Brown admitted she did not want to speak to the police or come to court.

¶ 12 The State entered a stipulation that assistant State's Attorney Morgan Carpel would testify that he asked Brown before the grand jury what she saw after the shooting, and Brown answered she saw defendant with his hand up and arm extended.

¶ 13 Defendant testified that in 2010 he lived in Indiana, but his family still lived in the neighborhood. He was at the school after the tournament ended and spoke to Kenyetta Johnson. Defendant knew Coles from the neighborhood and met Mallett three weeks prior to the shooting through a "lady friend" "in the adult entertainment business" who danced for "those guys." Defendant explained that after Coles did not pay the woman, he saw Mallett "on the joint" where "they sold drugs," determined that Mallett worked for Coles, and told Mallet to pay. When Mallett

replied he was not "paying *** s***," defendant told him to pay $60 or defendant would "knock every teeth [*sic*] in his mouth down his throat." After defendant hit Mallett, Mallett paid. Defendant told Mallett that he would be in the neighborhood and for Coles to "holler" at him. Coles later flagged defendant down and said not to "ride" his employee like that. Defendant replied that he only hit Mallett and said to "pay up." Defendant told Coles that no one would "walk off with the product that you [are] selling, so pay baby girl for the service she rendered."

¶ 14 Earlier on the night of the shooting, defendant saw Coles and Mallett selling drugs on his mother's block. Later at Delano, Coles and Mallett looked at him "threateningly." Mallett had a "bulge" in the pocket of his shorts. At one point, the men approached him. Coles signaled to Mallett to draw a firearm, so defendant got his firearm and held it at his side. Defendant had a firearm because after the incident with Mallett, Coles told him that he could no longer visit his mother. Coles asked Mallett to give him a firearm and began talking and gesturing at defendant. Defendant ultimately shot Coles, panicked when he heard people yelling "grab the gun," and fled. He returned to Indiana and was arrested a year later.

¶ 15 During cross-examination, defendant denied punching Mallett; rather, he slapped him. When he spoke to detectives, he stated that Mallett told him to discuss the money with Coles. However, defendant thought that Mallett was just as guilty since he participated "in the act." He denied telling officers that after hitting Mallett, he said to tell Coles's "b*** a*** I said get up on me." Defendant began carrying a firearm after hearing Coles say, "tell that b*** a*** n*** he can't come see his mama no more." The night of the shooting, Coles and Mallett gave defendant "crawling eyes," like they "wanted to eat" him. Defendant believed Coles and Mallett came to kill him and was ready to defend himself. He had "no choice" but to stand up for himself after Coles

said he could no longer see his mother. Throughout his life "in that neighborhood," "those people" bothered defendant because he did not have "cases pending" like "those guys." Defendant saw Johnson and another man, Warren Rhodes, that evening, but Miller and Brown were not present. Defendant noted that Rhodes came to court one day, then texted that he was getting "too much BS" in the neighborhood for testifying for defendant. Witnesses did not come to court because they were scared.

¶ 16   Johnson, who knew defendant, Coles, and Mallett from the neighborhood, testified that he attended the basketball tournament. Later that evening, he saw Coles and defendant talking, but could not hear anything. He saw Mallett, who was standing two to three feet behind Coles, hand Coles a firearm. Once Johnson saw the firearm, he moved away. He then heard a gunshot and saw Coles fall to the ground. Coles's firearm also fell to the ground and a "drug addict" picked it up.

¶ 17   During cross-examination, Johnson acknowledged prior convictions for criminal trespass to residence, a Class X "narcotics offense," and unauthorized use of a weapon by a felon. He was six to eight feet from defendant and Coles and did not see defendant shoot Coles because he "scramble[ed]" out of the way once he saw Coles with a firearm. He did not speak to the police at the scene and did not know that defendant was charged until August 2011. In September 2011 defendant visited Johnson in jail after defendant "bonded out." Johnson asked defendant about his case, and defendant replied he was "fighting" it. After Johnson was released from custody in January 2015, he spoke to defendant twice more and asked about the case. Defendant was still "fighting" it. After hearing that defendant was on trial, Johnson came to court on August 29, 2017, two days prior, and spoke to defendant. This was the first time Johnson told defendant what he

saw the night of the shooting. Johnson then testified that he did not come to court two days earlier; rather, he spoke to defendant for the first time that day.

¶ 18    Kendall Frank, who grew up with defendant, Coles, and Mallett, testified that at one point, he saw defendant and Coles standing face-to-face on opposite sides of a gate. From 50 to 60 feet away, Frank watched as Coles walked to a "group of guys," was handed "something," and then returned to the gate. Coles began talking to defendant, and a "gun came up." The third time Coles pointed a firearm at defendant, defendant shot Coles. Although Frank did not speak to police at the scene, within the first couple months after the shooting he told an officer that he saw a firearm in Coles's hand. He also testified before the grand jury. Frank did not speak to defendant personally about testifying; rather, defendant asked anyone in the neighborhood who was a witness to testify. Frank did not want to testify because he was raised not to speak to the police.

¶ 19    During cross-examination, Frank denied discussing the case with Johnson or defendant. He met with defendant once and gave defendant's attorney his contact information. Frank told defendant's attorney that he saw Coles with a firearm. On the night of the shooting, Coles walked to a group that was four or five feet behind him, was handed something, and walked back to the gate. Frank admitted that he testified before the grand jury that he did not see Coles with a firearm and that defendant moved " 'like he was going in his pocket to reach in for something,' " raised his arm toward Coles's face, and then there was a gunshot.

¶ 20    During redirect, Frank explained that at the grand jury he was only asked questions about what happened "before" Coles had a firearm. In other words, when "they [were] first standing at the gate, nobody had a gun." However, at one point, Coles walked to a group, obtained a firearm, and then pointed it at defendant.

¶ 21    During recross examination, Frank reiterated that he did not tell the grand jury that Coles had a firearm because he was "never asked." However, he "guess[ed]" that, when he was asked before the grand jury whether he saw anything in Coles's hands at any point that night, he answered no.

¶ 22    Rhodes testified that he previously did not appear in court after being served with a subpoena, but stated he came despite the fact that his testimony would endanger him in the neighborhood. Rhodes knew Mallett and defendant. Rhodes and Mallett both sold drugs. Rhodes attended the tournament and left around midnight through the gate on one side of the park. At this point, he saw Coles and Mallett walking toward defendant and then heard a gunshot. He did not see who fired. When he turned toward the gunshot, he saw Coles on the ground. He did not see a firearm in Coles's hands, but heard people yelling, "get the gun."

¶ 23    During cross-examination, Rhodes testified that he no longer sold narcotics. He acknowledged prior convictions for delivery of cannabis within 1000 feet of a school, possession of heroin with intent to deliver, and two prior convictions for delivery of a controlled substance. He did not see firearms in Coles's or Mallett's hands. During redirect, Rhodes testified that he feared Coles's people from the neighborhood.

¶ 24    The defense entered a copy of Coles's armed robbery conviction, which the State stipulated was under the alias of Reggie Mason.

¶ 25    In rebuttal, the State presented Chicago police detective Carlos Cortez, who testified that on August 4, 2010, Frank did not say that he saw Coles with a firearm. During a July 23, 2011 conversation with defendant, defendant stated he hit Mallett "in the mouth" and said to tell Coles's "b*** a***" to "get up" on him.

¶ 26    During cross-examination, Cortez testified that he had trouble identifying witnesses and other witnesses refused to speak to him. He acknowledged that defendant stated Coles had a firearm. Although defendant identified potential witnesses, when Cortez contacted them, no one spoke to him. When he then "brought back" witnesses to ask whether Coles had a firearm, they answered in the negative.

¶ 27    The State entered a certified copy of Johnson's conviction for home invasion. The video recording of defendant's statement was also admitted without objection and is included in the record on appeal.

¶ 28    In closing argument, the defense argued that Mallett handed Coles a firearm which he waived as he made threats. The defense acknowledged that defendant had a firearm, believed his life was in danger, and responded by firing his weapon. The defense concluded that the State's witnesses gave a version of events that protected Coles. The trial court then asked how to reconcile Johnson's testimony that Mallett and Coles were together and Mallett handed Coles a firearm with Frank's testimony that Coles turned around, walked away, and received a firearm from an unidentified person in a group. Trial counsel noted that Mallett testified that he was 30 feet from Cole whereas other witnesses placed them within "feet" of each other. Counsel concluded even if Coles did not initially have a firearm, someone gave him one and there was "ample opportunity" for someone to grab it after the shooting. In rebuttal, the State argued that no witness placed Coles and Mallett next to each other. The State further argued that there was no neighborhood conspiracy; rather, defendant was the aggressor and shot the unarmed Coles.

¶ 29    The court found Brown's testimony that defendant and Coles argued, defendant had a firearm, and neither Mallett nor Coles had a firearm to be credible. The court further found it

"obvious" that Brown was afraid, was uncomfortable testifying about Coles, and did not want to testify about defendant. The court noted that Brown's testimony was corroborated "in great part" by Mallett and Miller, and found Johnson and Frank to be unbelievable as they described "irreconcilable" facts that did not corroborate defendant's testimony. The court therefore found that the State proved each element of first degree murder beyond a reasonable doubt. Although the court did not believe defendant's testimony that Coles waived a firearm and acted in an "erratic matter," the court believed there was "serious bad blood" between the men, defendant knew Coles was a "rough character," and defendant believed facts existed that would justify the force he used. However, the court determined defendant's belief was unreasonable and found him guilty of second degree murder.

¶ 30    Defendant filed a motion to reconsider or for a new trial. After hearing argument on the motion, the trial court reiterated that a person is justified in the use of force against another which is intended or likely to cause death or great bodily harm only if, in pertinent part, he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself. The court noted that Brown, Miller, and Mallett all saw defendant with a firearm and stated it did not believe "a word" of the testimony stating Coles had a firearm. The court further stated that defendant "established the existence of what [he] believed was this mitigating fact, this right to use self-defense *** under these circumstances." However, what defendant "thought was not just unreasonable, it was outrageously unreasonable, because this man, *** did nothing more than run off at the mouth." The court concluded that second degree murder was "the proper call" and denied the motion.

¶ 31 The matter proceeded to sentencing. Defendant's presentence investigation report (PSI) listed a prior conviction in Wisconsin for resisting or obstructing the police for which he was fined. The PSI further stated that he was raised by his mother, earned a GED, and was previously employed in a factory. He was supported by his girlfriend, had five children, and took medication for diabetes and high blood pressure.

¶ 32 In aggravation, the State presented Detective Cortez, who testified that in July 2011 Mallett made a written statement indicating that a few days before the shooting defendant exited a vehicle, struck him in the face with a handgun, removed $60 from his pocket, and left. This incident arose from a payment dispute between defendant's female friend and Coles and Mallett.

¶ 33 The State presented the victim impact statements of Coles's mother and sisters, who described him as someone who loved to laugh and was protective of his family, denied he was a drug lord, and stated he obtained his cooking sanitation license shortly before his death. The defense presented letters from three of defendant's family members, his best friend, and his pastoral counselor stating that he was family oriented and a "great dad," had never been in any trouble, and had a "great reverence" for God.

¶ 34 Brianna Gonzalez, defendant's 11-year-old daughter, testified that defendant did everything around the house, helped her grandmother, and bought "pets and stuff." She loved her father and wanted him to come home. Temeka Thomas, defendant's sister, testified that defendant was family oriented and concluded there was "a loss on both ends" because defendant could be taken from his children for "a lot of years." Thomas also apologized to Coles's family.

¶ 35 The State then argued that the shooting was not a "one off" situation; rather, it had progressed from defendant offering the "services of a lady" to Coles and Mallett to defendant

deciding to be "the collector" and confronting Mallett. Defendant was the aggressor in that instance and on the night of the shooting, launching a "preemptive strike" when there were other ways to diffuse the situation. In mitigation, the defense argued that defendant was the eldest of four children and took a parenting role because his father was not around, obtained a GED, and left his crime "riddled" neighborhood to raise a family. Defendant did what he believed was necessary to protect himself and his family after they were threatened by Coles, whom defendant believed was a "drug lord." In allocution, defendant apologized and told the court that he was not a murderer.

¶ 36    In sentencing defendant to 15 years in prison, the court noted "defendant has no history of prior delinquency of criminal activity of criminal activity that been shown to [the court]." However, the court "characterized" defendant's belief that he was entitled to use the force he did as "outrageously unreasonable." Although the court did not believe that defendant went to Delano intending to kill Coles, his actions were "so outrageous" that incarceration was appropriate to deter others from committing the same type of offense to settle "petty slights." Defendant filed a motion to reconsider his sentence alleging his sentence was excessive considering his "overall lack of criminal background," which the trial court denied.

¶ 37    On appeal, defendant first contends his conviction for second degree murder should be reversed because the State did not disprove beyond a reasonable doubt that his lethal use of force was not lawful and justified.

¶ 38    A challenge to the sufficiency of the evidence requires the reviewing court to consider whether, viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *People v. Gray*, 2017 IL 120958, ¶ 35. It is for the trier of fact to resolve conflicts in the testimony, weigh the

evidence, and draw reasonable inferences from the facts. *Id*. A reviewing court will not substitute its judgment for that of the trier of fact on questions involving the weight of the evidence or witness credibility. *Id*. A defendant's conviction will be reversed only when the evidence is so unreasonable, improbable, or unsatisfactory that it created a reasonable doubt of his guilt. *People v. Newton*, 2018 IL 122958, ¶ 24.

¶ 39    In the case at bar, defendant was charged with first degree murder, raised the affirmative defense of self-defense, and was convicted of second degree murder. Relevant here, a person commits second degree murder when he commits the offense of first degree murder and, at the time of the offense, "believes the circumstances to be such that, if they existed, would justify or exonerate the killing *** but *** [that] belief is unreasonable." 720 ILCS 5/9-2(a)(2) (West 2010). This form of second degree murder is known as imperfect self-defense, and " 'occurs when there is sufficient evidence that the defendant believed he was acting in self-defense, but that belief is objectively unreasonable.' " *People v. Castellano*, 2015 IL App (1st) 133874, ¶ 148 (quoting *People v. Jeffries*, 164 Ill. 2d 104, 113 (1995)).

¶ 40    Self-defense is an affirmative defense and a lawful justification for first degree murder, as a person is justified in the use of deadly force if he reasonably believed that the force was necessary to prevent imminent death or great bodily harm to himself or another. 720 ILCS 5/7-1 (West 2010); *Jeffries*, 164 Ill. 2d at 127. Once a defendant raises this affirmative defense, "the State has the burden of proving beyond a reasonable doubt that the defendant did not act in self-defense, in addition to proving the elements of the charged offense." *People v. Lee*, 213 Ill. 2d 218, 224 (2004). The State carries this burden if it negates any one of the elements of self-defense beyond a reasonable doubt. *Jeffries*, 164 Ill. 2d at 127-28.

¶ 41    The elements of self-defense are that: (1) unlawful force was threatened against a person, (2) the person threatened was not the aggressor, (3) the danger of harm was imminent, (4) the use of force was necessary, (5) the person threatened actually and subjectively believed a danger existed that required the use of the force applied, and (6) the beliefs of the person threatened were objectively reasonable. *Lee*, 213 ll. 2d at 225.

¶ 42    Defendant does not dispute that he shot Coles. Rather, he argues, as he did before the trial court, that he acted in self-defense when Coles threatened him with a firearm. The trial court found defendant's belief that he needed to defend himself by shooting Coles was unreasonable, *i.e.*, the State negated the sixth element of self-defense. Thus, the question before this court is whether any rational trier of fact could have reached the same conclusion.

¶ 43    The reasonableness of a defendant's belief that the use of deadly force was necessary depends on the surrounding facts and circumstances and is a question of fact. *People v. Rodriguez*, 336 Ill. App. 3d 1, 15 (2002). Accordingly, when weighing the evidence, the court must consider the probability or improbability of the testimony, the circumstances surrounding the killing, and the testimony of other witnesses. *Id.*

¶ 44    Viewing the evidence in the light most favorable to the State, as we must, we find a rational trier of fact could have found the State proved beyond a reasonable doubt that defendant's belief that he acted in self-defense when he shot Coles was unreasonable. As the trial court noted, the witnesses agreed that defendant and Coles conversed, and that at some point defendant drew a firearm. Although defendant, Frank, and Johnson testified that Coles had a firearm, the State's three witnesses and defense witness Rhodes testified that Coles did not have one. The trial court noted that while there may have been "bad blood" between defendant and Coles due to their prior

interactions, the only thing Coles did on the night of the shooting was "run off at the mouth," which did not justify the use of deadly force. Taking all the evidence in the light most favorable to the State, as we must, there was sufficient evidence from which a rational trier of fact could have determined that defendant's belief that he was threatened by Coles was objectively unreasonable. *People v. Brown*, 2013 IL 114196, ¶ 48.

¶ 45 Defendant, however, contends that the trial court "erroneously" discounted the testimony of the defense witnesses and should have discounted the "clearly biased" testimony of the State's witnesses. He argues that Coles and Mallett, leaders of a "large" drug operation, were likely to be carrying weapons and the testimony that they were unarmed cannot be "squared" with that fact. He also argues that the State's witnesses had relationships with Coles which would have biased their testimony, noting that Brown had a child with Coles's brother, Mallett was Coles's best friend, and Miller worked for Coles. He also contends that the trial court improperly discounted the defense witnesses due to an "erroneous" determination that their testimony was inconsistent.

¶ 46 To the extent defendant argues that Coles and Mallett were likely armed due to their work in the drug trade, Mallett admitted that he was a drug dealer but denied carrying a firearm in order to avoid "heat." Moreover, defendant was not afraid to confront Coles and Mallett over the refusal to pay his female friend, assault Mallett, and demand money. The trial court was aware of the relationships Brown, Mallett, and Miller had with Coles and it was for the court, as the trier of fact, to determine what weight to afford their testimony. See *People v. Lenz*, 2019 IL App (2d) 180124, ¶ 115 ("[w]e afford great deference to the trial court's assessment of witness credibility, because it was in a superior position to observe the witnesses' demeanor and resolve any conflicts in their testimony").

¶ 47 Regarding Johnson and Frank, the trial court found their testimony incredible and inconsistent. Johnson testified that Mallett, who was two to three feet behind Coles, handed Coles a firearm that was taken by an unidentified drug addict after Coles was shot. Frank, however, testified he watched from 50 to 60 feet as Coles walked to a "group of guys," was handed "something" and then returned to the gate where Coles pointed a firearm at defendant. However, Frank admitted that he testified before the grand jury that he did not see Coles with a firearm and explained that he was only asked questions about the time "before" Coles had a firearm. Although trial counsel attempted to reconcile the witness's different explanations for how Coles obtained the firearm, the trial court was unpersuaded and stated that this inconsistency affected the weight afforded their testimony. The record also reveals that neither Johnson nor Frank spoke directly to defendant about what they saw. Although Johnson admitted to asking defendant about the case in 2011 and 2015, he asserted he did not tell defendant that he saw Coles with a firearm until the trial had commenced in 2017.

¶ 48 The court discounted the testimony that Coles was armed in light of the other evidence presented at trial, and we defer to that credibility determination. *Gray*, 2017 IL 120958, ¶ 35. Ultimately, defendant's arguments are a request to reweigh the evidence in his favor and substitute our judgment for that of the trier of fact. This we cannot do. See *People v. Abdullah*, 220 Ill. App. 3d 687, 693 (1991) ("A reviewing court has neither the duty nor the privilege to substitute its judgment for that of the trier of fact."). In the case at bar, it was the responsibility of the trial court, as the trier of fact, to determine witness credibility and resolve any inconsistencies and conflicts in the evidence. *Brown*, 2013 IL 114196, ¶ 48. Presented with conflicting versions of events, the court did not need to accept as true defendant's assertion that defendant feared for his life and shot

Coles because Coles was armed; it was entitled to choose between the competing versions. See *People v. Villareal*, 198 Ill. 2d 209, 231 (2001). A trier of fact is not required to disregard inferences flowing naturally from the evidence before it, nor need it search out all possible explanations consistent with innocence and raise them to the level of reasonable doubt. *In re Jonathon C.B.*, 2011 IL 107750, ¶ 60.

¶ 49    Accordingly, a rational trier of fact could conclude the State proved beyond a reasonable doubt that defendant's use of force was unreasonable and excessive, thus defeating his claim of self-defense. See *Jeffries*, 164 Ill. 2d at 127-28 ("[i]f the State negates *any one* of the self-defense elements, the defendant's claim of self-defense must fail" (emphasis in original.)). A defendant's conviction will be overturned only if the evidence is so unreasonable, improbable, or unsatisfactory that there remains a reasonable doubt of his guilt (*Brown*, 2013 IL 114196, ¶ 48); this is not one of those cases. We therefore affirm defendant's conviction for second degree murder.

¶ 50    Defendant next contends that the trial court abused its discretion when it imposed a 15-year sentence considering the applicable mitigating factors and lack of aggravation.

¶ 51    When determining a sentence, "the trial court has broad discretionary powers." *People v. Stacey*, 193 Ill. 2d 203, 209 (2000). Substantial deference is given to the trial court because "the trial judge, having observed the defendant and the proceedings, is in a much better position to consider factors such as the defendant's credibility, demeanor, moral character, mentality, environment, habits, and age." *People v. Snyder*, 2011 IL 111382, ¶ 36. A reviewing court will therefore not alter a defendant's sentence absent an abuse of discretion by the trial court. *People v. Alexander*, 239 Ill. 2d 205, 212 (2010). A trial court abuses its discretion in determining a

sentence where the sentence is greatly at variance with the spirit and purpose of the law or if it is manifestly disproportionate to the nature of the offense. *Id*.

¶ 52    A trial court is not required to expressly outline its reasoning for a sentence, and absent some affirmative indication to the contrary, other than the sentence itself, a reviewing court presumes that the trial court considered all mitigating factors on the record. *People v. Perkins*, 408 Ill. App. 3d 752, 762-63 (2011); see also *People v. Gordon*, 2016 IL App (1st) 134004, ¶ 51 (absent evidence to the contrary, we presume that the sentencing court considered all mitigating evidence presented). A defendant's rehabilitative potential is not entitled to greater weight than the seriousness of the offense (*People v. Reed*, 2018 IL App (1st) 160609, ¶ 62), and "the presence of mitigating factors requires neither a minimum sentence nor precludes a maximum sentence" (*People v. Jones*, 2014 IL App (1st) 120927, ¶ 55).

¶ 53    When a sentence falls within statutory guidelines, it is presumed proper. *People v. Knox*, 2014 IL App (1st) 120349, ¶ 46. Second degree murder is a Class 1 felony (720 ILCS 5/9-2(d) (West 2010)) with a sentencing range of 4 to 20 years in prison (730 ILCS 5/5-4.5-30(a) (West 2010)). Because defendant's 15-year sentence falls within these statutory guidelines, we must presume it is proper. *Knox*, 2014 IL App (1st) 120349, ¶ 46.

¶ 54    Nevertheless, defendant contends that the sentence is excessive because he had no criminal history and led a law-abiding life, and it will impose undue hardship on his children for whom he was the primary parent. He further argues there were substantial grounds to excuse his criminal conduct when he was threatened by "likely" armed members of a drug-dealing organization following a "violent conflict" and threats to leave the neighborhood, and asserts these particular circumstances are unlikely to reoccur.

¶ 55　At sentencing, the trial court heard evidence in aggravation and mitigation, defendant's statement in allocution, and considered defendant's PSI. A trial court is not required to expressly outline its reasoning when crafting a sentence and we presume that the court considered all mitigating factors and the defendant's rehabilitative potential unless the defendant makes an affirmative showing to the contrary. *People v. Brazziel*, 406 Ill. App. 3d 412, 434 (2010). Here, defendant cannot make such a showing when the trial court specifically noted that defendant had no history of delinquency, and evidence of defendant's family ties were before the court.[2] *Id*. The court further stated that although it did not believe that defendant arrived with the intent to kill Coles, defendant's actions were "so outrageous" that incarceration was necessary to deter others from committing a similar offense in order to settle "petty slights." See *People v. Wilson*, 257 Ill. App. 3d 670, 705 (1993) ("In addition to [the] defendant's potential for reform, the trial court may also consider the recognized interest in protecting the public and in providing a deterrent."). The trial court was not required to give more weight to the mitigating evidence than to the seriousness of the offense (see *Reed*, 2018 IL App (1st) 160609, ¶ 62), and accordingly, we find the court did not abuse its discretion in sentencing defendant to 15 years' imprisonment.

¶ 56　For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 57　Affirmed.

---

[2] Although defendant's PSI showed a conviction in Wisconsin for resisting or obstructing the police, the trial court apparently did not consider it when imposing sentence.